No. 86,277

In the Matter of the Appeal of PANHANDLE EASTERN PIPE LINE
Co. and NATIONAL HELIUM CORP., *et al.*, from a Denial of
Refund of KANSAS CORPORATE INCOME TAX.

(39 P.3d 21)

Opinion filed January 25, 2002.

*John Michael Hale*, of Kansas Department of Revenue, Legal Services Bureau, argued the cause and was on the briefs for appellant.

*Paul H. Frankel*, of Morrison & Forester LLP, of New York, New York, and *Jack Glaves*, of Glaves, Irby and Rhoads, of Wichita, argued the cause, and *Donald J. Horttor*, of Cosgrove, Webb & Oman, of Topeka, and *Dennis Ng*, of Dennis Ng & Associates, of Houston, Texas, were with them on the brief for appellees.

The opinion of the court was delivered by

ABBOTT, J.: The Kansas Department of Revenue (Department) appeals the Board of Tax Appeals' (BOTA) final order finding that Panhandle Eastern Pipe Line Co. (Panhandle) and National Helium Corp. (Helium) were a unitary business under K.S.A. 79-32,141. At stake in this appeal is a corporate tax refund, including interest, of approximately $26 million. The Department appealed pursuant to K.S.A. 2000 Supp. 74-2426 and K.S.A. 77-621. The matter is before this court pursuant to a K.S.A. 20-3018(c) transfer.

The Department attempts to insert the red herring issue of whether its bright line test is rationally related to the controlling statute for unitary businesses, K.S.A. 79-32,141. The bright line test is that before the Department will consider whether two or more businesses are operating as a unitary business, one entity must show it owns more than 50% of the other entity. This rule is not reflected in the language of the Kansas statutes, case law, or even in the Department's published regulations. The issue is a red herring because (1) the bright line test is only a rule of thumb used

by auditors, not a published regulation or policy; (2) the test may not have been in use during the time period in question; and (3) BOTA's standard of review of the Department's decision was de novo, not a mere rationality review. As the paramount tax agency in the state of Kansas, BOTA need not defer to the Department's findings or an unpublished bright line test (with no basis in the Kansas statutes or case law). While the Department argues that BOTA should have deferred to its bright line rule, BOTA did not address this issue or make any findings in regard to its validity.

On July 22, 1986, Panhandle and Helium requested permission from the Department to amend corporate tax returns and to file a combined report as a unitary business for tax years 1981-1984. On September 10, 1987, the Department denied Panhandle's request to file a combined return including Helium, rejected its amended returns, and denied Panhandle's refund claim. The Department's position was that 50 percent ownership of Helium by Panhandle was insufficient for a unitary business determination for the purpose of combined reporting. Thereafter, Helium requested a hearing on the matter.

A prehearing conference was conducted on February 21, 1994, before Alisa M. Dotson. Three days later, Dotson issued an order directing the Department to file a motion for summary judgment. On December 15, 1994, Dotson authored an order granting in part and denying in part the Department's motion for summary judgment. Dotson concluded that (1) the Department failed to establish that more than 50 percent ownership of a corporation's voting stock was required as a matter of law to make a unitary business determination; (2) that an issue of fact remained as to whether Helium was unitary with Panhandle; and (3) that Panhandle should be allowed to present arguments at an evidentiary hearing.

The Department moved to vacate Dotson's order, however. On October 3, 1995, the acting Secretary of Revenue, Karla J. Pierce, vacated the order to the extent that it purported "to define controlling Kansas law regarding the ownership requirement for combined reporting." Pierce noted that Dotson's order "failed to give due consideration to whether the department's standard of requiring more than 50 percent ownership was reasonable," and "con-

cluded the order should be vacated in its entirety and that the matter should proceed to formal hearing on all issues of fact and law."

At an informal conference on February 11, 1998, Panhandle presented witness testimony. On September 4, 1998, Pierce issued her final determination finding that, as a matter of law, Panhandle and Helium could not be unitary "because Panhandle's ownership of Helium [was] not more than 50%." In short, Pierce ruled that without ownership of more than 50 percent of the stock of Helium, Panhandle could not establish, as a matter of law, the right to file a combined return; hence, there was no necessity to look into the facts.

Pursuant to K.S.A. 2000 Supp. 74-2438, Panhandle filed an appeal with BOTA on September 22, 1998. BOTA conducted a 3-day trial on September 15 through 17, 1999.

Kenneth Kalen, who had served in the capacity of vice president, president, and chief operating officer of Panhandle, and vice chairman of the board of Helium, testified at the BOTA hearing regarding the history and interrelationship of Panhandle and Helium.

Kalen stated that Panhandle began as a small intrastate gas system in eastern Kansas around 1930, but developed into one of the larger gas transmission companies, serving customers in Kansas, Missouri, Illinois, Indiana, Ohio, Michigan, and Canada. Panhandle owned extensive gathering systems in western Kansas, Oklahoma, and Texas, which company officials refer to as the "West End" gathering systems. Kalen explained that these systems converge at Liberal, Kansas, where the mainline compressor station compresses the gas which is sent east through the pipeline to Panhandle customers. Following the passage of the Helium Act Amendments of 1960, see 50 U.S.C. § 167 *et seq.* (1994), Kalen said representatives from the federal government contacted Panhandle to encourage the company to build a facility to extract helium from gas taken from the Hugoton Gas Field. According to Kalen, Panhandle discussed the possibility of constructing a helium extraction facility with its "sister" corporation, National Distillers and Chemical Corporation (Distillers).

Stanley Wilbers, who worked as senior auditor and accountant for Panhandle and later became the vice president/treasurer and controller of Helium in 1976, testified that Helium was formed in 1960. Wilbers testified that "Helium agreed to supply helium to the United States government in the amount of $15,200,000 a year and, based on the initial contract price of eleven seventy-eight an Mc.f., the quantity amounted to 1.3 billion cubic feet of helium."

Kalen noted that Panhandle's chief executive officer and the chief executive officer of Distillers served on each other's board of directors. James Crozier, who served as a vice president and general manager for a division of Distillers called UFI, as well as on Helium's board of directors, testified at the hearing that Panhandle owned at least 9 percent of Distiller's outstanding shares and was its single largest stockholder from 1981 to 1984.

Kalen stated that top level managers of Panhandle and Distillers agreed to build the helium plant as a joint project and worked together during the development and construction of the facility. Each company invested equity investments of $2.6 million (520 shares each) in Helium, and the balance of the $25 million cost was financed with five different banks by Panhandle's financial personnel. The helium extraction facility was constructed on land purchased by Helium from Panhandle, adjacent to Panhandle's compressor station. During construction, Panhandle provided on-site project engineers at its own expense.

Although Helium had legal title to the facilities and retained control over hiring and firing employees, Panhandle owned 50 percent of its stock and Distillers owned 50 percent. Panhandle and Distillers agreed to restrict the sale of stock, and there was a letter agreement to a first right of refusal between the parties.

According to Kalen, because Panhandle's entire gas stream coming into the Liberal compressor station would be processed by Helium, Panhandle had a vested interest in protecting the integrity of its pipeline system. During contract negotiations between Panhandle, Distillers, and Helium, Panhandle inserted clauses in the contract giving it the right to approve the design of piping in and out of the helium plant and to review maintenance procedures. Panhandle retained the right to "inspect the plant from time to time

for the purpose of satisfying itself as to the adequacy of operation and maintenance."

Initially, 5 of the 10 officers of Helium were chosen from Panhandle's staff, and the vice president of transmission with Panhandle, F.J. McElhatton, was named president of Helium. The chairman of Panhandle, William Maguire, became chairman of Helium, and Panhandle's general counsel also served as general counsel for Helium. During the 1981 to 1984 period, Helium had 10 officers; 5 from Panhandle, 3 from Helium, and 2 from Distillers.

Panhandle employees were given an opportunity to go to work for Helium at its inception. Helium employees enjoyed the same benefit package as Panhandle employees and Helium employees belonged to Panhandle's employees' credit union. When a job came up for bid at either Panhandle or Helium, the employees of both companies were given the opportunity to bid on it. No employees from Distillers transferred to Helium after its incorporation, however.

Wilbers and Kalen both testified that the president of Helium reported directly to Kalen, then president of Panhandle. Panhandle furnished Helium with daily forecasts of its gas volumes so Helium could adjust its operations to accommodate the expected volumes. Crozier's testimony confirmed that Panhandle exercised control over the day-to-day operations of Helium. By contrast, Wilbers and Kalen testified that Distillers was not active in the day-to-day operations of Helium, and only met annually with Helium to review budgets and declare dividends.

Kalen agreed that the operations of Panhandle and Helium were functionally integrated and centrally managed by Panhandle so it could maintain the integrity of its pipeline system. Moreover, he acceded that the Panhandle-Helium operating relationship could be characterized as different steps in a large vertically structured enterprise.

For example, Panhandle was the sole supplier of natural gas to Helium. The consumption requirements of Panhandle's customers dictated what gas would be available for processing at Helium. In addition, Panhandle was Helium's sole source of legal, tax planning, and preparation services and helped with Helium's employee stock

option plan. Helium did pay Panhandle a service fee of a quarter of a million dollars a year for those services. As Helium processed the gas, certain ancillary products such as butane and propane were produced and captured. Century Refining Company, a wholly owned subsidiary of Panhandle, was primarily responsible for marketing the butane and propane for Helium.

According to Kalen, the operations of Helium were intertwined with Panhandle because it was "absolutely necessary that the helium plant compressors continued to function, as our own compressors function every day, ever hour; and it just was an integral part of the total operations." In addition, "the helium plant was in effect preparing the gas for quality control to meet [Panhandle's] mainline tariff specifications . . . [by removing] the water content and hydrocarbon content . . . ."

In addition, the emergency shutdown systems of the two companies were tested at the same time because each operation was dependent on the other. Panhandle performed engineering studies for Helium and provided welders and other workers when needed. Laboratory services were provided to Helium by Century Refining. Helium management had full use of Panhandle's airplanes and travel services department. The Panhandle employee newsletters included information concerning notices of employee transfers, retirements, deaths, service awards, and other announcements at Helium.

Wilbers noted that there was an ongoing exchange of Helium employees to Panhandle and its subsidiary, Anadarko. When Panhandle built its plant in Lake Charles, Louisiana, to process liquefied natural gas, an electrician, maintenance supervisor, and two operators were transferred there from Helium. According to Wilbers, all employee benefits, retirement privileges, and vacation time were also transferred.

Kalen stated that after about 10 years, the government prematurely canceled its contract for the purchase of helium. In 1997, Distillers ultimately divested itself of its Helium stock by selling it to Panhandle.

At the BOTA hearing, Panhandle presented testimony of expert witnesses J. Thomas Johnson, Walter Hellerstein, J.D., Richard D. Pomp, and Dr. Richard E. Olson.

Johnson, a partner in charge of state and local tax practice for the Chicago firm of KPMG, LLP, formerly served as Illinois Director of Revenue. Johnson testified that the purpose for the language in K.S.A. 79-32,141 "owned or controlled directly or indirectly by the same interests," is to

"really look at how did the ownership really exist, because if you didn't include 'indirect,' there would be all kinds of opportunity to avoid the ownership attribution. The reason why you have both 'direct and indirect' in most state laws is so that a taxpayer would not be able to manipulate the facts to avoid the consequences of the ownership and control that really exists economically . . . ."

Furthermore, Johnson stated:

"I don't think there is a threshold requirement of ownership in the statute. It says controlled or owned, as I understand, so, I mean, you could have a situation where there is no or a very small percentage, ownership and if you controlled the company through debt instrument or some other way you would still meet that test."

Johnson then testified that, in light of his experience as tax commissioner, "there's no question that the unitary relationship existed, not only for the audit period, but, in all likelihood, probably existed far before that audit period . . . ."

Hellerstein, a University of Georgia law professor and author of a well-recognized treatise on state taxation, testified "in my judgment, this is just a very easy case on the question of whether or not these two entities are unitary." Hellerstein said:

"[A]s a matter of substance, you have a single operational enterprise here from, I'm going to say, the wellhead to the gas pump. Here, you have the gas flowing, so you can actually watch the product flow back and forth and the essentialness of one company's operation to the other.

"Obviously, Helium couldn't extract liquids unless they got the gas, and they got the gas from Panhandle; and Panhandle couldn't have sold the gas unless they had the liquid removed; and that's what Helium did.

"So you couldn't ask for more operational interdependence. Dependency and contribution, flow of value, flow of goods, whatever your test is, it's met here."

In addition, Hellerstein stated that although the Secretary of Revenue was given the discretion to define "ownership or control" under K.S.A. 79-32,141, "clearly the Secretary does not have the discretion to issue a regulation inconsistent with the statutory man-

date." Hellerstein's expert report concluded: "[T]he evidence is clear that 'the actual exercise of control' [of Helium] rested with Panhandle."

Pomp, a University of Connecticut Law School professor and visiting Harvard law professor in the area of federal, state, and local corporate income taxation, testified that, in essence, the Panhandle-Helium relationship was a vertically integrated operation. According to Pomp, "a vertically integrated manufacturing activity is the quintessential of a unitary business for which a combined report is needed."

Pomp noted that the wording of K.S.A. 79-32,141 parallels language found in 26 U.S.C. § 482 (1994) allowing the Internal Revenue Service (IRS) Commissioner "to distribute, apportion or allocate gross income, deductions, credits, or allowances between businesses . . . *'owned or controlled, directly or indirectly, by the same interests.'* " (Emphasis added.) An IRS/Treasury regulation defines "controlled" for 26 U.S.C. § 482 to mean: " 'any kind of control, direct or indirect, whether legally enforceable or not, and however exercisable or exercised, including control resulting from the actions of two or more taxpayers acting in concert or with a common goal or purpose. It is the reality of the control that is decisive, not its form or the mode of its exercise.' " See 26 C.F.R. § 1.482-1(i)(4), p. 538 (2001). Pomp further related to the hearing panel that federal case law interpreting 26 U.S.C. § 482 had relaxed the requirement of majority stock ownership. Quoting an unidentified commentator, Pomp read a footnote discussing 26 U.S.C. § 482 cases: " 'While, in some early cases, the courts were reluctant to find control of a corporation absent actual ownership of a majority stock interest, this position has long since been overruled.' "

Olson, a professor and former Dean of Washburn University School of Business, noted that under securities law, more specifically the Williams Act, 15 U.S.C. § 78m(g) (2000), the threshold percentage of stock ownership that could demonstrate control of a corporate entity is 5 percent. Therefore, Olson agreed that the 9 percent interest Panhandle had in Distillers would be considered significant, requiring Panhandle to file reports with the Security and Exchange Commission.

Olson testified that in his opinion, in economic terms, the United States Supreme Court's and the Kansas Supreme Court's dependency/contribution test meant that companies were unitary "if they are essentially interwoven or intertwined, [and could not] operate very well independently, or could not operate well without each other." Olson stated the two companies were completely integrated functionally. He concluded that "Panhandle treated Helium as pretty much as a company of its own . . . and they did control the day-to-day operation."

At the hearing, other witnesses were questioned as to whether the Secretary of Revenue had disseminated an agency definition of "ownership or control" under K.S.A. 79-32,141 to mean more than 50 percent direct control during the 1981-1984 reporting period.

Alan Corey, who worked for the Department as a revenue audit manager from September 1979 to March 1992, testified on behalf of the Department. Corey confirmed that audit managers and members of the Legal Services Bureau at the Department had discussed the facts of this case. Corey said the discussion dealt with whether 50 percent ownership was sufficient, and he stated he did not believe there necessarily was a clear policy established for 50 percent ownership at that time.

Earl Agent, a corporate auditor for the Department since the fall of 1986 or 1987, testified on behalf of the Department that from the time he began his initial training, the policy for combined reporting was that there had to be " 'more than 50 percent' ownership." He admitted on cross-examination, however, that he did not have anything in writing confirming that policy, and stated, "That has been my interpretations [sic] from the instructions that I have been given since I started with the department, doing corporate income taxes."

Carol Ireland also testified on behalf of the Department. Ireland said she had worked for the Department since June 1, 1978, and since 1987 had worked in the capacity of an audit manager. She did not recall any time approving combined reporting for entities who owned 50 percent or less of another entity, and that her understanding of this policy came from training out in the field. On

cross-examination, Ireland confirmed that taxpayer's Exhibit 22 appeared to be the official policy of the Department at the time.

Karen Warner, C.P.A., testified on behalf of Panhandle that Department policies given to her in early 1986 during her training as a corporate income tax auditor contained a specific provision concerning ownership percentage for combined reporting. According to Warner, taxpayer's Exhibit 22 was used during Department training sessions in 1986. The first page of that exhibit is entitled "Corporate Training Outline." In that document, the Department policy on required percentage of ownership for combined reporting states: "Combined stock return includes only those corporations engaged in the unitary business and connected through *at least 50% stock ownership.*" (Emphasis added.)

On October 9, 2000, BOTA filed an order finding that (1) Panhandle and Helium were engaged in the same general line of business; (2) were vertically integrated; (3) shared management; (4) that Panhandle had over 50% control of Helium through direct and indirect means; and (5) were unitary. Therefore, BOTA determined that Panhandle and Helium were entitled to file combined income tax reports. The Department filed a petition for reconsideration on October 23, 2000, which was denied by BOTA on November 7, 2000.

On December 6, 2000, the Department filed a timely notice of appeal with BOTA and the clerk of the appellate courts. The matter is before this court pursuant to a K.S.A. 20-3018(c) transfer.

## I. STANDARD OF REVIEW

The Department appeals BOTA's final determination finding that Panhandle and Helium were a unitary business under K.S.A. 79-32,141. In an appeal from an order of BOTA, K.S.A. 77-621 controls this court's scope of review. See K.S.A. 2000 Supp. 74-2426(c) (stating that actions of BOTA are subject to review in accordance with the Act for Judicial Review and Civil Enforcement of Agency Actions, K.S.A. 77-601 *et seq.*).

Within the Act for Judicial Review and Civil Enforcement of Agency Actions, K.S.A. 77-621(a) provides that unless "this act or another statute provides otherwise: (1) The burden of proving the

invalidity of agency action is on the party asserting invalidity." Additionally, K.S.A. 77-621(c) specifies that this court may grant relief from an order of BOTA only if we determine that:

"(1) The agency action, or the statute or rule and regulation on which the agency action is based, is unconstitutional on its face or as applied;

"(2) the agency has acted beyond the jurisdiction conferred by any provision of law;

"(3) the agency has not decided an issue requiring resolution;

"(4) the agency has erroneously interpreted or applied the law;

"(5) the agency has engaged in an unlawful procedure or has failed to follow prescribed procedure;

"(6) the persons taking the agency action were improperly constituted as a decision-making body or subject to disqualification;

"(7) the agency action is based on a determination of fact, made or implied by the agency, that is not supported by evidence that is substantial when viewed in light of the record as a whole, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this act; or

"(8) the agency action is otherwise unreasonable, arbitrary or capricious."

We note that under K.S.A. 77-621, this court's standard of review for an appeal from a BOTA decision is "somewhat broader than the traditional three-pronged scope of review as set forth in *Kansas State Board of Healing Arts v. Foote*, 200 Kan. 447, Syl. ¶ 1, 436 P.2d 828 (1968)." *In re Tax Appeal of A.M. Castle & Co.*, 245 Kan. 739, 741, 783 P.2d 1296 (1989). In *Foote*, this court noted that in reviewing the decision of an agency, a district court could not, on appeal, substitute its conclusion for that of the administrative tribunal, but was confined to the traditional three-part determination of whether, as a matter of law, "(1) the tribunal acted fraudulently arbitrarily or capriciously, (2) the administrative order is substantially supported by evidence, and (3) the tribunal's action was within the scope of its authority." 200 Kan. 447, Syl. ¶ 1.

BOTA is considered the paramount, lawfully constituted taxing authority in Kansas. *Wirt v. Esrey*, 233 Kan. 300, 314, 662 P.2d 1238 (1983). Kansas statutory and case law mandate that, on appeal, the Department bears the burden of showing BOTA's decision was invalid. See K.S.A. 77-621(a)(1); see also *In re Tax Appeal of Scholastic Book Clubs, Inc.*, 260 Kan. 528, 536, 920 P.2d 947

(1996) (stating that the party challenging an action taken by BOTA has the burden of proving it erroneous).

A. BOTA's standard of review

The Department first asserts that because the action of denying Panhandle's request for combined reporting was within its grant of statutory authority to administer and enforce K.S.A. 79-32,141, its final decision was presumptively valid and therefore, under the doctrine of operative construction, was entitled to judicial deference by BOTA. In addition, the Department maintains that under the statutory language of K.S.A. 79-32,141, only the Director of Taxation may determine whether to allow a taxpayer to file income tax returns on a combined basis; thus, without a finding that the Director's decision was arbitrary, capricious, or unreasonable, BOTA's decision is simply a wrongful substitution of its own interpretation of the statute for that of the Director.

In essence, the Department asks this court to find that, in conducting its evaluation of the Department's final determination, BOTA failed to employ the correct standard of review. The Department asserts that "the Board's inquiry was limited solely to whether the director's discretion was arbitrary, capricious or unlawful."

We first look to the Kansas statutes for BOTA's grant of authority and proper standard of review. In K.S.A. 74-2437, the legislature granted BOTA the authority to hear appeals from the Director of Taxation and the Director of Property Valuation. In 1997, the legislature amended K.S.A. 74-2438, giving BOTA the authority to hear appeals from final decisions of the Secretary of Revenue or the Secretary's designee. See L. 1997, ch. 126, § 5. Panhandle filed its notice of appeal of the Secretary of Revenue's final determination on September 22, 1998, and BOTA conducted a hearing on September 15-17, 1999. K.S.A. 2000 Supp. 74-2438 states, in pertinent part:

"An appeal may be taken to the state board of tax appeals from any finding, ruling, order, decision, final determination or other final action, including action relating to abatement or reduction of penalty and interest, on any case of the secretary of revenue or the secretary's designee by any person aggrieved thereby. . . . Upon receipt of a timely appeal, the board shall conduct a hearing

in accordance with the provisions of the Kansas administrative procedure act. The hearing before the board shall be a de novo hearing unless the parties agree to submit the case on the record made before the secretary of revenue or the secretary's designee." (Emphasis added.)

BOTA's order of October 9, 2000, states:

"This Board conducted a hearing in these matters on September 15-17, 1999. After considering all of the evidence presented thereat, and being fully advised in the premises, the Board finds and concludes as follows:
"1. The Board has jurisdiction of the subject matter and of the parties, a proper and timely appeal having been filed, pursuant to K.S.A. 74-2438, and amendments thereto."

Nothing in the record reflects any agreement by the parties to submit the case on the record made before the designee of the Secretary of Revenue. We conclude BOTA conducted a de novo review of this case.

Panhandle cites *In re Appeal of Colorado Interstate Gas Co.*, 270 Kan. 303, 14 P.3d 1099 (2000), in support of its position that BOTA did not err in using a de novo standard of review. There, we considered the taxpayer's contention that BOTA improperly determined that the order of the Director of Property Valuation (PVD) was entitled to deference and "that its standard of review was to determine whether the PVD intentionally and grossly disregarded the standards prescribed by K.S.A. 79-5a04." 270 Kan. at 315. We reviewed K.S.A. 1996 Supp. 74-2438, and held that

"the hearing before BOTA shall be a de novo hearing unless the parties agree to submit the case on the record made before the PVD. The definition of a de novo hearing is a decision of the matter anew, giving no deference to findings and conclusions previously made. Thus, BOTA has the power and authority to exercise its judgment anew and independent of the PVD in determining the assessment of state assessed property, with no deference given to the valuation made by the PVD." 270 Kan. 303, Syl. ¶ 1.

The Department cites the following cases in support of its contention that BOTA should have given its interpretation more deference: *Udall v. Tallman*, 380 U.S. 1, 16, 13 L. Ed. 2d 616, 85 S. Ct. 792, *reh. denied* 380 U.S. 989 (1965); *Boatright v. Kansas Racing Comm'n*, 251 Kan. 240, 246, 834 P.2d 368 (1992); *State Dept. of SRS v. Public Employee Relations Board*, 249 Kan. 163, 166,

815 P.2d 66 (1991); *Kaufman v. Kansas Dept. of SRS*, 248 Kan. 951, 960, 811 P.2d 876 (1991); *Kansas Bd. of Regents v. Pittsburg State Univ. Chap. of K-NEA*, 233 Kan. 801, 809, 667 P.2d 306 (1983); *Crawford Manufacturing Co. v. State Comm. of Revenue and Taxation*, 180 Kan. 352, Syl. ¶ 4, 304 P.2d 504 (1956); *Wyandotte County Gas Co. v. Commission of Revenue and Taxation*, 155 Kan. 619, 127 P.2d 481 (1942); *Nutrena Mills, Inc. v. State Tax Comm.*, 150 Kan. 68, 91 P.2d 15 (1939).

In the United States Supreme Court case of *Tallman*, the dispute centered around the Bureau of Land Management's denial of leasing permits to drill for oil in the Kenai National Moose Range in Alaska, and the Secretary of the Interior's later affirmance of the decision. The case involved the judicial review of an agency interpretation of an executive order. We note that the *Tallman* Court stated that a court must give "great deference to the interpretation given [a] statute by the officers or agency charged with its administration." 380 U.S. at 16. We conclude, however, that this case has little bearing where, by statute, a party may appeal one agency's decision to another highly specialized agency, such as the BOTA.

Of the Kansas cases cited by the Department, almost all reflect the same procedural pattern of judicial review of an underlying agency decision and do not concern the issue of combined reporting. *Crawford Manufacturing Co.* is the sole exception. In *Crawford Manufacturing Co.*, the principle question was whether the Director of Revenue correctly determined that the direct or separate accounting method used by the appellant did not clearly reflect income and that the business of appellant was unitary in character with respect to its three plants. Procedurally, *Crawford* begins in amanner similar to this case. Following the Director of Revenue's determination of unity and assessment of additional Kansas income tax, appellant requested review of the decision by the State Commission of Revenue and Taxation (Commission). Next, however, the action was tried in Wyandotte District Court pursuant to G.S. 1949, 74-2426, which provided for the judicial review of orders of the Commission; thus, despite similarities to the substantive issue raised in this case, *Crawford* does not provide instruction

procedurally on the correct standard of review to be used by BOTA when considering an appeal from a decision of the Department.

*Colorado Interstate Gas Co.* presents stare decisis authority that cannot be ignored. In accordance with our decision in *Colorado Interstate Gas Co.*, and the language of K.S.A. 2000 Supp. 74-2438, we conclude that in reviewing Panhandle's appeal of the final decision of the Department, BOTA employed the proper standard of review when it considered the matter de novo.

B. The Department's bright line rule

On appeal, the Department raises the tangential issue of whether its "bright line test" is rationally related to the controlling statute for unitary businesses, K.S.A. 79-32,141. Under the Department's bright line test, before it will begin to consider whether two or more entities are operating as a unitary business, one entity must show it owns more than 50 percent of the stock of the other entity or entities. This issue was not specifically addressed in BOTA's order. Because this was listed as an issue of law for BOTA's determination at the prehearing conference, however, the inference may be drawn that BOTA decided the issue in the negative. Therefore, the matter deserves some comment.

K.S.A. 79-32,141, the controlling statute for combined reporting, reads:

"The director may allocate gross income, deductions, credits, or allowances between two or more organizations, trades or businesses (whether or not incorporated, or organized in the United States or affiliated) owned or controlled directly or indirectly by the same interests, if the director determines such allocation is necessary to prevent evasion of taxes or to clearly reflect income of the organizations, trades or businesses."

In addition, the Department has promulgated a published regulation concerning K.S.A. 79-32,141, which states:

"A taxpayer may have more than one (1) 'trade or business.' In such cases, it is necessary to determine the business income attributable to each separate trade or business. The income of each business is then apportioned by an apportionment formula which takes into consideration the instate and outstate factors which relate to the trade or business the income of which is being apportioned.

"The determination of whether the activities of the taxpayer constitute a single trade or business or more than one (1) trade or business will turn on the facts in each case. In general, the activities of the taxpayer will be considered a single

business if there is evidence to indicate that the segments under consideration are integrated with, dependent upon, or contribute to each other and the operations of the taxpayer as a whole. The following factors are considered to be good indicia of a single trade or business, and the presence of any of these factors creates a strong presumption that the activities of the taxpayer constitute a single trade or business: (a) A taxpayer is generally engaged in a single trade or business when all of its activities are in the same general line.

"(b) A taxpayer is almost always engaged in a single trade or business when its various divisions or segments are engaged in different steps in a large, vertically structured enterprise.

"(c) A taxpayer which might otherwise be considered as engaged in more than one (1) trade or business is properly considered as engaged in one (1) trade or business when there is a strong central management, coupled with the existence of centralized departments for such functions as financing, advertising, research, or purchasing. Thus, some conglomerates may properly be considered as engaged in only one (1) trade or business when the central executive officers are normally involved in the operations of the various divisions and there are centralized offices which perform for the divisions the normal matters which a truly independent business would perform for itself, such as accounting, personnel, insurance, legal, purchasing, advertising, or financing." K.A.R. 92-12-72.

Under K.S.A. 79-32,141, the Director of Taxation is given the authority to "allocate gross income, deductions, credits, or allowances between two or more organizations . . . owned or controlled directly or indirectly by the same interests . . . ." The authority of the Department is subject to review, however, in that the legislature has conferred upon BOTA the authority to hear appeals of decisions of the Secretary of Revenue or the Secretary's designee. See K.S.A. 2000 Supp. 74-2438. BOTA is the paramount, lawfully constituted taxing authority in Kansas and, as such, "functions independently of the Director in matters of administrative judgment and decision." *Northern Natural Gas Co. v. Dwyer*, 208 Kan. 337, 365, 492 P.2d 147 (1971), *cert. denied* 406 U.S. 967 (1972).

Moreover, in *Colorado Interstate Gas Co.*, this court wrote:

"K.S.A. 1996 Supp. 74-2438 requires that BOTA exercise its judgment anew and independent of the PVD. It provides that the hearing before BOTA 'be a de novo hearing unless the parties agree to submit the case on the record made before the director [now Secretary of Revenue].' The very definition of a de novo hearing is '[a] reviewing court's decision of a matter anew, giving no deference

to a lower court's findings.' Black's Law Dictionary 725 (7th ed. 1999)." 270 Kan. at 316-17.

We note that the evidence presented at the hearing does not support the Department's claim that its 50 percent ownership bright line interpretation of K.S.A. 79-32,141 was in effect for the 1981-1984 reporting period in question. In addition, the more than 50 percent ownership requirement referred to by the Department as a bright line rule was never published in the Kansas Administrative Regulations.

Alan Corey stated he did not believe there necessarily was a clear policy established for 50 percent ownership during that time period. Earl Agent admitted that he could not point to anything in writing confirming the 50 percent ownership policy, even though his interpretation of the statute was that it required more than 50 percent ownership. Karen Warner produced a document used by the Department in training with a written policy on required percentage of ownership for combined reporting. That document stated: "Combined stock return includes only those corporations engaged in the unitary business and connected through at least 50% stock ownership." Carol Ireland confirmed that the document appeared to be the official written policy of the Department at the time.

The Department's more than 50 percent ownership rule is not reflected in the language of the Kansas statutes, case law, or even in the Department's published regulations. BOTA did not mention the 50 percent ownership rule or make any findings in regard to its validity, and it was not necessary for BOTA to do so. The question of whether the bright line test is rationally related to the statute is a red herring issue because (1) the bright line more than 50 percent test is not mandated by the language of K.S.A. 79-32,141 or K.A.R. 92-12-72; (2) the test may not have been in use during the time period in question; and (3) BOTA's standard of review of a Department decision is de novo, not mere rationality review.

Under K.S.A. 2000 Supp. 74-2438, BOTA was required to conduct its review in accordance with the provisions of the Kansas Administrative Procedure Act, K.S.A. 77-501 *et seq.* BOTA had the

authority to grant relief to Panhandle upon determining that the Department erroneously interpreted or applied the law. Thus, BOTA need not give deference to the Department's bright line test if it found the Department's rule was an erroneous interpretation of Kansas law.

BOTA bears an independent responsibility to review a decision of the Department; this responsibility is foreign to the concept of deference. *Colorado Interstate Gas Co.*, 270 Kan. at 318. It would be illogical to ask BOTA to conduct a totally independent review and yet to insist that BOTA defer to the Department's interpretation of statute. Therefore, we conclude that BOTA did not act unreasonably by choosing not to follow the Department's more than 50 percent rule and, instead, solely contemplating K.S.A. 79-32,141, K.A.R. 92-12-72, and Kansas case law in its resolution of the issue before it.

## II. DIRECT OR INDIRECT CONTROL OF HELIUM

The next issue for consideration is whether BOTA erred in its determination that Panhandle had direct or indirect control of Helium and enjoyed a unitary relationship such that combined reporting was appropriate. The Department claims that BOTA mistakenly concluded that Panhandle owned or controlled Helium. The Department further asserts that "[t]his case turns on the question of control as that term is used in K.S.A. 79-32,141."

> "In tax law the concept of unitary business arises when a corporation has one or more subsidiaries or divisions which are dependent . . . upon, or contribute to the parent corporation or other subsidiaries or divisions so, in essence, to constitute a homogenous enterprise. When such an entity exists it may be described as a unitary business and in determining the tax liability of the given subsidiary or division the taxing authority may consider the entire income of the unitary business and apportion taxes on the basis of the income attributable within the jurisdiction." *Pioneer Container Corp. v. Beshears*, 235 Kan. 745, 747, 684 P.2d 396 (1984).

In a series of cases beginning in 1980, the United States Supreme Court filed opinions discussing the unitary business doctrine. In *Mobil Oil Corp. v. Commissioner of Taxes*, 445 U.S. 425, 63 L. Ed. 2d 510, 100 S. Ct. 1223 (1980), the Court stated that a unitary business is characterized by "functional integration, cen-

tralization of management, and economies of scale." 445 U.S. at 438. This benchmark test was restated by the Court in *Allied-Signal, Inc. v. Director, Div. of Taxation*, 504 U.S. 768, 119 L. Ed. 2d 533, 112 S. Ct. 2251 (1992); *Container Corp. v. Franchise Tax Bd.*, 463 U.S. 159, 77 L. Ed. 2d 545, 103 S. Ct. 2933 (1983); *F.W. Woolworth Co. v. Taxation & Revenue Dept.*, 458 U.S. 354, 73 L. Ed. 2d 819, 102 S. Ct. 3128 (1982); and *Exxon Corp. v. Wisconsin Dept. of Revenue*, 447 U.S. 207, 64 L. Ed. 2d 66, 100 S. Ct. 2109 (1980).

In *ASARCO Inc. v. Idaho State Tax Comm'n*, 458 U.S. 307, 73 L. Ed. 2d 787, 102 S. Ct. 3103 (1982), the Supreme Court made another important distinction. There, one of ASARCO's four subsidiaries, M.I.M., was 52.7 percent owned by ASARCO. The Court, however, found ASARCO and M.I.M. were not operating as an unitary business because "[although ASARCO has the control potential to manage M.I.M., no claim is made that it has done so." 458 U.S. at 323. The Court noted that M.I.M.'s business operations were conducted "entirely independently" of ASARCO, that M.I.M.'s contacts with ASARCO were minimal, and that M.I.M. sold only about 1 percent of its output to ASARCO. 458 U.S. at 323. Thus, in *ASARCO*, the Court found the exercise of actual control to be more significant than the bare legal right to control a company. 458 U.S. at 326-28.

For purposes of Kansas state income tax, interrelated multijurisdictional corporations may be taxed on a unitary basis if the parent and the subsidiary share such an interdependent relationship so as "to form one integral business rather than several business entities." *Pioneer Container Corp.*, 235 Kan. 745, Syl. ¶ 3. "K.S.A. 79-32,141 authorizes utilization of the combined report method of allocation of income and expenses when it is properly determined two or more corporations are engaged in a multi-state unitary business." 235 Kan. at 757.

A review of Kansas decisions reveals that in order to determine whether a corporate entity and its affiliates are engaged in a unitary business activity, the dependency/contribution test is proper. In *Crawford Manufacturing Co.*, this court endorsed the dependency/contribution test for unitary business activity, stating:

"Whether a multi-state business is separate or unitary depends upon the manner in which its business is conducted. The essential test to be applied is whether or not the operation of the portion of the business within the state is dependent upon or contributory to the operation of the business outside the state. If there is such relationship, the business is unitary." 180 Kan. 352, Syl. ¶ 2.

"Stated another way, the test is whether a business' various parts are interdependent and of mutual benefit so as to form one business rather than several business entities and not whether the operating experience of the parts is the same in all places. [Citations omitted.] Various portions of a business may be carried on exclusively in different states without destroying its unitary character if the integral parts are of mutual benefit to one another." 180 Kan. at 359.

In its brief, the Department stated: "Kansas is a dependency/ contribution state, not a three unities state." The Department further admits that "there is no statute that specifically precludes combination if an entity owns 50% or less of a business interest's voting stock." Yet, much of the Department's brief concerns itself with the argument that controlling ownership (more than 50 percent) must be shown before a unitary relationship can be found.

To advance its argument that a more than 50 percent ownership requirement is a proper threshold determination, the Department cites California and North Dakota case law, and various statutes from the states of Maine, Colorado, Nebraska, New Mexico, New York, Ohio, Utah, and Virginia. The Department argues that because K.S.A. 79-32,141 was adopted as part of the Uniform Division of Income for Tax Purposes Act (UDITPA), K.S.A. 79-3271 *et seq.*, this court's interpretation of that statute should conform with the decisions of other states because "the bedrock of UDITPA is multistate uniformity." The Department's argument in favor of multistate conformity is unconvincing for several reasons. See also K.S.A. 79-4301 *et seq.* (Kansas Multistate Tax Compact).

First, established law in Kansas does not support a strict more-than-50-percent-ownership requirement. In *Pioneer Container Corp.*, this court examined the three-unities test used by California courts, which looks at: "unity of ownership; unity of operation as evidenced by central purchasing, accounting and management; and unity of use in its centralized executive force and general system of operation." 235 Kan. at 749. However, in *Pioneer Container*

*Corp.*, this court considered and rejected the three-unities test, instead upholding the dependency/contribution test.

In subsequent opinions, we have made it clear "that Kansas has adopted the dependency/contribution test as the appropriate test to be applied in determining whether two or more business entities are unitary for taxation purposes." *In re Tax Appeal of A.M. Castle & Co.*, 245 Kan. 739, 742-43, 783 P.2d 1296 (1989). See also *In re Tax Appeal of Broce Construction Co., Inc.*, 27 Kan. App. 2d 967, 971-76, 9 P.3d 1281 (2000) (restating and applying the dependency/contribution test).

Second, according to the United States Supreme Court, there is no necessity for multistate uniformity in this area of the law. In *Container Corp.*, the Court stated: "A final point that needs to be made about the unitary business concept is that it is not, so to speak, unitary: there are variations on the theme, and any number of them are logically consistent with the underlying principals motivating the approach." 463 U.S. at 167.

Third, rather than striving for uniformity with other state interpretations, this court may instead strive to achieve uniformity with federal law. One scholar writing about the adoption of UDITPA in Kansas noted that the technical advisory committee "used the approach of conforming the Kansas Act to the federal Code," and stated that K.S.A. 79-32,141 was "comparable to section 482 of the Code." Cordes, *The Kansas Conformity Income Tax Act: Part II*, 17 K.L.R. 289, 289, 309 (1969).

When two or more businesses are controlled by the same interests, the Commissioner of Internal Revenue may allocate or distribute income to prevent tax evasion under the authority of 26 U.S.C. § 482. "No definition of 'control' is contained in section 482. It has been opined that this omission was intentional in order to allow for flexibility of administration. [Citation omitted.]" *B. Forman Company v. C.I.R.*, 453 F.2d 1144, 1152 (2d Cir. 1972), *cert. denied* 407 U.S. 934 (1972). The IRS/Treasury Regulation, 26 C.F.R. § 1.482-1(i)(4), p. 538 (2001), states, however, that "[t]he term 'controlled' includes any kind of control, direct or indirect, whether legally enforceable, and however exercisable or exercised.

It is the reality of the control which is decisive, not its form or the mode of its exercise."

In *B. Forman Company,* the United States Court of Appeals for the Second Circuit considered the applicability of 26 U.S.C. § 482 where two competing corporations, McCurdy and Forman, agreed to form a third corporation, Midtown, to develop a shopping center which would adjoin the rear entrances to their respective stores. "McCurdy and Forman had no common shareholders, directors or officers." 453 F.2d at 1147. McCurdy and Forman each owned 50 percent of the shares of Midtown. The Board of Directors of Midtown was comprised of three directors designated by McCurdy and three designated by Forman. The taxpayers contended that 26 U.S.C. § 482 was not applicable because neither McCurdy nor Forman controlled Midtown. The Second Circuit court disagreed, stating:

"In order to find control, no percentage requirements are specified nor are any precise requirements necessary. The trend in the recent case law is to apply the realistic approach. [Citations omitted.]

. . . .

"To contend that these parents do not control their child is to fly in the face of reality. They have had complete control of Midtown from the day of conception (its incorporation) throughout the years relevant to this case. Every act of Midtown has been dictated by papa and mamma who, directly or indirectly, have financed its career and controlled its every move." 453 F.2d at 1153.

To construe K.S.A. 79-32,141 consistently with the federal interpretation of 26 U.S.C. § 482, this court should take note of the decision in *B. Forman Company, Inc.,* allowing allocation where the corporate parents each owned 50 percent of a third subsidiary corporation. See 453 F.2d at 1155-57.

Fourth, although the statutes of other states mandate the requirement of more than 50 percent ownership to show control, case law often must relax this requirement to reflect corporate reality. For example, under the three-unities test, the California Revenue and Tax Code § 25105 (West 1992) defined unity of ownership: "Direct or indirect ownership or control of more than 50 percent of the voting stock of the taxpayer shall constitute ownership or control for purposes of this article." See *Rain Bird Sprin-*

*kler Mfg. Corp. v. Franchise Tax Bd.*, 229 Cal. App. 3d 784, 789, 280 Cal. Rptr. 362 (1991). However, the California Court of Appeals has held that ownership and control may be attributed to two corporate partners who each own 50 percent of a third corporation's stock. See *Hugo Neu-Proler Internat. Sales Corp. v. Franchise Tax Bd.*, 195 Cal. App. 3d 326, 332, 240 Cal. Rptr. 635 (1987); see also *Rain Bird Sprinkler Mfg. Corp.*, 229 Cal. App. 3d at 792-93, n. 6 (declining to follow the more than 50 percent ownership rule blindly).

For these reasons, this court concludes that, under K.S.A. 79-32,141, a strict requirement of more than 50 percent ownership is not necessary to demonstrate control in a unitary business relationship.

Next, we must consider whether BOTA erred in its determination that Panhandle had direct or indirect control of Helium and enjoyed a unitary relationship such that combined reporting was appropriate. The Department argues that the substantive facts did not establish that Panhandle controlled Helium. Instead, the Department contends that either "1) Helium made the major policy decisions or performed the major executive functions by itself; or, 2) the major policy decisions and major executive functions were performed by Panhandle *only in concert with Distillers.*"

In regard to the second alternative, the Department argues for the first time on appeal that Helium had two equal masters, Panhandle and Distillers. The question of whether Distiller's enjoyed a unitary relationship with Helium and Panhandle was not at issue in the BOTA proceedings. BOTA identified the issue before it as "whether Panhandle Eastern Pipeline Company and National Helium Corporation should be considered unitary . . . ." In an appeal from an administrative agency decision, one is limited to the issues raised at the administrative hearing. *In re Tax Appeal of Intercard, Inc.*, 270 Kan. 346, 347, 14 P.3d 1111 (2000). Because this issue was not raised below, we cannot address it here.

The only remaining issue is whether BOTA erred in its determination that the substantive facts established that Panhandle directly or indirectly controlled Helium. The Department asserts that BOTA's decision was in error because substantive facts demon-

strate that Helium made major policy decisions or performed the major executive functions by itself.

"BOTA is a specialized agency that exists to decide taxation issues, and its decisions should be given great weight and deference when it is acting in its area of expertise." *In re Tax Appeal of Univ. of Kan. School of Medicine*, 266 Kan. 737, 749, 973 P.2d 176 (1999) (citing *In re Tax Appeal of Boeing Co.*, 261 Kan. 508, 515, 930 P.2d 1366 [1997]). Under the Kansas Act for Judicial Review and Civil Enforcement of Agency Actions, this court may grant relief "only when it has made certain determinations, including that the agency erroneously interpreted or applied the law, that the agency made determinations of fact not supported by substantial evidence, that the agency engaged in an unlawful procedure or failed to follow prescribed procedure, or that the agency acted unreasonably, arbitrarily, or capriciously." *In re Tax Appeal of Chief Industries, Inc.*, 255 Kan. 640, 643-44, 875 P.2d 278 (1994) (listing the grounds for relief found in K.S.A. 77-621[c][4],[5],[7], and [8]). The Department bears the burden of proving the invalidity of BOTA action. 255 Kan. at 643.

To support its position that Helium performed major executive functions independently, the Department notes that Helium owned title in all of its facilities and equipment, hired and fired its own employees, approved its own budget, and paid Panhandle for accounting, legal, and employee stock option plan services. In addition, Helium hired and fired top level managers, and Helium's board approved its purchases, not Panhandle.

BOTA's findings were incorporated in its order of October 9, 2000. Using the test set forth in *A.M. Castle & Co.*, BOTA found that: (1) Helium and Panhandle were engaged in the same general line of trade or business—that of processing and transporting natural gas; (2) that expert witness testimony established that Panhandle and Helium were vertically integrated and dependent on each other; and (3) that due to shared board members, shared administrative and marketing services, and Panhandle's more than 50 percent control of Helium through direct and indirect means, the evidence showed centralized management.

At the hearing, both Kalen and Wilbers testified that the president of Helium reported directly to the president of Panhandle. Distillers was not active in the day-to-day operations of Helium, but Panhandle exercised control over the day-to-day operations of Helium. In addition, Distillers only met annually with Helium to review budgets and declare dividends.

Kalen agreed that the operations of Panhandle and Helium were functionally integrated and centrally managed by Panhandle so it could maintain the integrity of its pipeline system. Kalen stated it was "absolutely necessary that the helium plant compressors continued to function, as our own compressors function every day, ever hour; and it just was an integral part of the total operations." Moreover, he acceded that the Panhandle-Helium operating relationship could be characterized as different steps in a large vertically structured enterprise, wherein "the helium plant was in effect preparing the gas for quality control to meet [Panhandle's] main-line tariff specifications . . . [by removing] the water content and hydrocarbon content . . . ."

At the BOTA hearing, the testimony of Panhandle's expert witnesses J. Thomas Johnson, Walter Hellerstein, J.D., Richard D. Pomp, and Dr. Richard E. Olson supported the finding of BOTA that Panhandle and Helium operated in a unitary fashion.

Johnson testified that, in light of his experience as tax commissioner, "there's no question that the unitary relationship existed, not only for the audit period, but, in all likelihood, probably existed far before that audit period . . . ."

Hellerstein characterized the operation as a "single operational enterprise" where one company's operation was essential to the other. Hellerstein stated: "Dependency and contribution, flow of value, flow of goods, whatever your test is, it's met here." Hellerstein's expert report concluded, ". . . the evidence is clear that 'the actual exercise of control' [of Helium] rested with Panhandle."

According to Pomp, "a vertically integrated manufacturing activity is the quintessential of a unitary business for which a combined report is needed," and the Panhandle-Helium relationship evidenced a vertically-integrated operation.

Olson noted that under securities law, the 9 percent interest Panhandle had in Distillers would be considered significant. Olson further testified that in economic terms this court's dependency/contribution test meant that companies were unitary "if they are essentially interwoven or intertwined, [and could not] operate very well independently, or could not operate well without each other." He concluded that "Panhandle treated Helium as pretty much as a company of its own . . . and they did control the day-to-day operation."

None of the arguments of the Department serve to convince us that BOTA erroneously interpreted or applied the law, made determinations of fact not supported by substantial evidence, engaged in an unlawful procedure or failed to follow prescribed procedure, or acted unreasonably, arbitrarily, or capriciously.

Affirmed.

DAVIS, J., not participating.

BRAZIL, Chief Judge Retired, assigned.