No. 62,954

In The Matter of the Appeal of A. M. CASTLE & Co. from a
Notice of Assessment of Additional Corporate Income Tax.

(783 P.2d 1296)

Opinion filed December 8, 1989.

*David Prager, III,* of the Kansas Department of Revenue, argued the cause and *Mark A. Burghart,* general counsel, was with him on the brief for appellant.

S. *Lucky DeFries*, of Schroeder, Heeney, Groff & Coffman, a professional association, of Topeka, argued the cause and was on the brief for appellee.

*John K. Van De Kamp*, attorney general of the State of California, *Robert F. Tyler*, supervising deputy attorney general, *Robert D. Milam*, deputy attorney general, and *Benjamin F. Miller*, counsel for multistate tax affairs, were on the *amicus curiae* brief for the California Franchise Tax Board.

*Gene Corrigan*, executive counsel, of Boulder, Colorado, was on the *amicus curiae* brief for the Multistate Tax Commission.

*David L. Skidgel*, of McAnany, Van Cleave & Phillips, P.A., of Kansas City, *F. Leo Faust* and *Albert D. Kramer*, of Bartlesville, Oklahoma, and *Herbert L. Awe* and *William L. Goldman*, of Lee, Toomey & Kent, of Washington, D. C., were on the *amicus curiae* briefs for Phillips Petroleum Company.

The opinion of the court was delivered by

HOLMES, J.: This is an appeal by the Kansas Department of Revenue (the Department) from an order of the Kansas Board of Tax Appeals (the BOTA) which denied an additional assessment of income tax asserted by the Department against A.M. Castle & Co. (Castle) for the years 1977 through 1979. The denial of the assessment was based upon a determination by the BOTA that Castle and its wholly-owned subsidiary, Hy-Alloy Steels Company (Hy-Alloy), were not conducting a unitary business during the tax period.

In 1982, the Department determined that Castle and Hy-Alloy were conducting a unitary business during calendar years 1977 through 1979. The Department prepared a combined report for Castle and Hy-Alloy, pursuant to K.S.A. 79-32,141, and assessed additional corporate income taxes against Castle in the amount of $24,698. After discovery and a formal hearing, the Director of Taxation upheld the assessment. Castle appealed to the BOTA and, on August 10, 1988, the BOTA reversed the Director's finding that Castle and Hy-Alloy were unitary and ordered the assessment of additional income taxes abated. The Department appealed the decision of the BOTA to the Kansas Court of Appeals (K.S.A. 1988 Supp. 74-2426[c][3]), and the case was transferred to the Supreme Court pursuant to K.S.A. 20-3018(c).

The Department asserts several arguments in support of its appeal, but both parties apparently concede that the controlling issue is whether the BOTA was correct in its determination that

Castle and Hy-Alloy were not conducting a unitary business. Before turning to a determination of that issue, some preliminary observations would appear to be warranted.

At the outset, the briefs reflect some confusion as to the scope of review of an appeal from the BOTA. K.S.A. 1988 Supp. 74-2426(c) specifically provides that orders of the BOTA are subject to judicial review in accordance with the Act for Judicial Review and Civil Enforcement of Agency Actions, K.S.A. 77-601 *et seq.* Under that act our scope of review is controlled by K.S.A. 77-621, which is somewhat broader than the traditional three-pronged scope of review as set forth in *Kansas State Board of Healing Arts v. Foote*, 200 Kan. 447, Syl. ¶ 1, 436 P.2d 828 (1968).

In its order the BOTA appears to confuse the term "consolidated return" with the term "combined report," and apparently has used the terms interchangeably. This case involves a determination by the Department that Castle must submit a combined report. In *Pioneer Container Corp. v. Beshears,* 235 Kan. 745, 684 P.2d 396 (1984), the court discussed the distinction between the two terms, pointing out that the consolidated return, as provided by K.S.A. 79-32,142, is a method whereby two or more corporations are treated as a single taxpayer and are required to file a consolidated tax return. The court then explained a combined report, stating:

"A *combined report is not the same as a consolidated return* and does not in any way result in the taxing of one corporation on or measured by the income of another. Actually, the combined report is not a tax return, but, rather, is in the nature of an information return. Notwithstanding its use, each corporation doing business in the taxing state is taxed on or measured by only its own income from sources within the state. However, if the corporation doing business in the state is a member of an affiliated group conducting a business within and without the state, then instead of computing the income attributable to the state on the basis of the corporation's books of account (which may reflect the operation of only a small segment of the business), the apportionment is made with reference to the income from the entire business just as would be done if the business had been conducted by one entity." 235 Kan. 753.

In *Pioneer* we held:

"The Director of Revenue is authorized by K.S.A. 79-32,141 to require the combined report method of allocation of income and expenses when it

is determined that two or more corporations are engaged in a multi-state unitary business." 235 Kan. 745, Syl. ¶ 6.

The present case involves the filing of a combined report by Castle based upon the Department's contention that Castle and Hy-Alloy are engaged in a unitary business and does not involve the filing of a consolidated return by the two corporations.

The final preliminary matter to be considered is the proper basis or test to be applied in determining whether two or more entities are engaged in a unitary business. Two tests have been generally used in making such a determination. One is denominated as the three unities test and is based upon three factors, consisting of unity of ownership, unity of operations, and unity of use. This test was used by the California Court of Appeals in what is recognized as one of the leading opinions utilizing the three unities test. *Container Corp. of America v. Franchise Tax Bd.*, 117 Cal. App. 3d 988, 173 Cal. Rptr. 121 (1981), *aff'd* 463 U.S. 159, *reh. denied* 464 U.S. 909 (1983).

The second widely accepted test is the dependency/contribution test, which has been adopted in Kansas. In *Crawford Manufacturing Co. v. State Comm. of Revenue and Taxation*, 180 Kan. 352, 304 P.2d 504 (1956), the issue was whether Crawford, which conducted a multi-state manufacturing and selling business, constituted a unitary business for purposes of Kansas income tax. The court defined a unitary business and adopted the test to be applied in determining a unitary business as follows:

"A multi-state business is a unitary business for income tax purposes when the operations conducted in one state benefit and are benefited by the operations conducted in another state or states. If its various parts are interdependent and of mutual benefit so as to form one integral business rather than several business entities, it is unitary." Syl. ¶ 1.

"Whether a multi-state business is separate or unitary depends upon the manner in which its business is conducted. The essential test to be applied is whether or not the operation of the portion of the business within the state is dependent upon or contributory to the operation of the business outside the state. If there is such relationship, the business is unitary." Syl. ¶ 2.

In *Pioneer* the issue was whether Pioneer and its wholly-owned subsidiary, Pioneer Bag Company, constituted a unitary business requiring a combined report. The definition and test adopted in *Crawford* were also adopted and followed in *Pioneer*. 235 Kan.

745, Syl. ¶¶ 3 and 4. Thus, it is clear that Kansas has adopted the dependency/contribution test as the appropriate test to be applied in determining whether two or more business entities are unitary for taxation purposes.

In the present case, the BOTA apparently used the three unities test, stating that the Supreme Court recognized the test in *Pioneer*. That statement is incorrect. In *Pioneer* this court quoted from the BOTA order in that case. The BOTA order in *Pioneer* discussed *Container Corporation* and pointed out that the test used in that case was the three unities test, and then BOTA used that test in its determination that Pioneer was conducting a unitary business. We applied the dependency/contribution test and held that the conclusion of the BOTA that Pioneer and its subsidiary were engaged in a unitary business was correct. We did not adopt the three unities test in *Pioneer*, but adhered to our prior decision in *Crawford* that the appropriate test to be applied in Kansas is the dependency/contribution test. In the recent case of *First Nat'l Bank of Manhattan v. Kansas Dept. of Revenue*, 13 Kan. App. 2d 706, 779 P.2d 457 (1989), the Court of Appeals considered the issue of whether a bank holding company and its subsidiary bank constituted a unitary business. The court stated erroneously that we had adopted the three unities test, citing *Pioneer* for its authority. In doing so, the Court of Appeals confused our quote from the BOTA order in *Pioneer* with our actual holding.

The Department takes great umbrage with the BOTA for using the three unities test in the present case. It refers to the three unities test as lacking "clarity," and being "superficial" and "ambiguous," as well as "clumsy." However, the only witness who appeared from the Department was Robert Lewis, manager of the audit bureau, who testified that the Department utilized the three unities test in reaching its determination in this case. The Department is in no position to criticize the BOTA for relying on the same test that the Department used to find Castle and Hy-Alloy were unitary when that determination by the Department was before the BOTA for review. However, the use of the three unities test by the Department and the BOTA does not affect the outcome of this case. As a practical matter, the two tests overlap in many areas and many of the same facts and factors

are used in reaching a determination under either test. In the present case, based upon the record before us the ultimate decision of whether Castle and Hy-Alloy were operating as a unitary business is the same under either test.

In determining whether two or more business entities actually constitute a unitary business for state income taxation purposes, the application of the various tests is much more difficult than the definition of the test itself. Much has been written about the problems in determining when a business is unitary and the application of the various recognized tests and criteria to reach such a determination. For example, see Spears, *Application of the Unitary Business Concept to Diverse Businesses: Light at the End of the Tunnel or the Impossible Dream?*, 18 Pac. L.J. 1161 (1987); Keesling, *A Current Look at the Combined Report and Uniformity in Allocation Practices*, 42 J. Tax'n 106 (1975). The Department, by regulation, has attempted to specify some of the factors or criteria to be considered in determining whether two or more businesses are actually unitary in their operations. In K.A.R. 92-12-72, it is recognized that each case must be determined on its own facts, although certain broad general criteria are specified as indicative of a unitary business, including (a) whether the entities are engaged in the same general line of trade or business; (b) whether the various divisions or segments of the entities are engaged in different steps in a large, vertically structured enterprise; and (c) whether there is strong central management, coupled with the existence of centralized departments for such functions as financing, advertising, research, or purchasing. Other factors also must be considered in reaching a determination of whether Castle and Hy-Alloy were unitary in their operation. The entire record must be examined in the light of the test adopted in *Crawford* and *Pioneer*: "The essential test to be applied is whether or not the operation of the portion of the business within the state is dependent upon or contributory to the operation of the business outside the state." *Pioneer*, 235 Kan. 745, Syl. ¶ 4.

We now turn to the facts of this case and consideration of the controlling issue of whether the BOTA determination, that Castle and Hy-Alloy were not operated as a unitary business during the tax period in question, is supported by substantial evidence. The

only witnesses before the BOTA were Michael Simpson, the chairman of the board of Castle, and Robert Lewis, of the Department. The bulk of the evidence before the BOTA was documentary and is included in the record before this court.

Castle is a Delaware corporation with its principal place of business in Franklin Park, Illinois. Castle's business consists of purchasing ferrous and nonferrous metals in large quantities from mills and other sources and selling these metals to industrial customers. Castle maintains 20 warehouses or service centers across the nation in which it warehouses, often processes, and occasionally fabricates its metal products for sale to industrial customers. Castle's metal products include stainless steel, nickel, aluminum, brass, copper, and alloys of the same type. These metals are available in varying dimensions and shapes, such as round and flat bar, sheet, plate, tubing, and structural.

Hy-Alloy, a Delaware corporation, is a wholly-owned subsidiary of Castle. It operates from one location in Bedford Park, Illinois, as a national warehousing distribution service center of high alloy steels in bars, rounds, and flats. Specifically, Hy-Alloy purchases "carbon alloy bars," one particular classification of specialty metals, from suppliers and mills and sells its product in less than mill quantity amounts; it does no fabrication work.

Hy-Alloy formerly did business as an Illinois corporation and had no connection with Castle. In January 1973, Hy-Alloy and its stockholders entered into an agreement to sell all of the assets of Hy-Alloy to Hyas Co., a wholly-owned subsidiary of Castle formed for the purpose of purchasing the Hy-Alloy assets. The purchase agreement included the right to the corporate name of Hy-Alloy and, after the consummation of the sale, the name of Hyas Co. was changed to Hy-Alloy Steels Company. Castle was also a party to the purchase agreement. The acquisition of the Hy-Alloy assets was financed by a loan in the approximate amount of $3,000,000, from the First National Bank of Chicago to Hyas Co. and guaranteed by Castle. Castle paid the loan and then treated it as a loan from Castle to Hy-Alloy. The balance of the loan was paid by Hy-Alloy in 1978.

As indicated above, Castle and Hy-Alloy were in the same general line of business and Castle owned 100% of the capital stock of Hy-Alloy. It is obvious that Castle, as the sole stockholder

of Hy-Alloy, had total control of the election of directors of Hy-Alloy, who in turn were responsible for the management of the corporation and the hiring of its officers and management personnel. An examination of the corporate records of Castle and Hy-Alloy reveals that Castle held regular quarterly board meetings where management policies and decisions were explored in considerable detail. On the other hand, the minutes of the board meetings of Hy-Alloy reflect that for the most part the meetings were perfunctory in nature with many board decisions being made by consent without any actual meeting. Even some of the annual meetings, where officers were elected and managerial salaries determined, were held in such fashion without any actual meeting of the board. During the taxable years in question, Castle and Hy-Alloy had at least three common corporate officers, and all but one of the Hy-Alloy directors was also a director or officer of Castle. Mr. M. Simpson, the president of Hy-Alloy and a member of its board of directors, was also a vice-president and member of the board of Castle. His salary was paid by Castle and apparently he received no salary from Hy-Alloy. The managerial control of Hy-Alloy by the officers and directors of Castle would appear obvious. It is also clear that Hy-Alloy did have some of its own supervisory personnel who were responsible for the day-to-day run-of-the-mill operations of Hy-Alloy, independent of consultation with Castle.

In 1978, based upon a study financed by Castle, it was decided that Hy-Alloy should expand its operations, and Castle loaned Hy-Alloy $2,500,000 for the expansion project. Financing for this loan was obtained through industrial revenue bonds issued on behalf of Castle by the Village of Bedford Park, Illinois. The loan to Hy-Alloy by Castle was on the same general terms as the bond proceeds received by Castle. The expansion of Hy-Alloy increased its capacity by nearly 90% with much of the increase being sold to Castle, allowing it, in turn, to maintain a more complete and diverse inventory of alloy products. As much as 50% of Hy-Alloy's sales were made to Castle and, although made at prevailing market prices, resulted in a steady source of supply for Castle. Although only a small amount of Hy-Alloy products were sold in Kansas, Hy-Alloy was a primary source of carbon alloy steel for all of Castle's locations.

In addition to intercompany product sales, it is clear that the two entities participated in intercompany sales or exchanges of capital assets. In 1979 Hy-Alloy purchased a Coleco material handler for its book value of $40,020.08, and a racking system was transferred for its book value of $245,171.43. Castle initiated these transfers or sales when it could not obtain book value on the open market. On the other hand, Hy-Alloy was benefited by the rack exchange, which was at a price of $150,000 to $200,000 less than it had anticipated paying for a similar system. The exchange of assets worked both ways, with Castle on one occasion purchasing a front-end loader from Hy-Alloy.

In the area of management, Hy-Alloy made 5- and 15-day business activity reports to Castle, although Mr. Simpson testified this was done more as a courtesy to Castle than for informational purposes. Hy-Alloy also made monthly budget reports to Castle, which Castle used for various tax purposes and to keep its top management informed about its investment in Hy-Alloy. At each quarterly board meeting of Castle, Mr. Simpson, the president of Hy-Alloy, a vice-president of Castle, and a member of the board of both corporations, gave a verbal report on the activities of Hy-Alloy and submitted quarterly budgets on behalf of Hy-Alloy.

Although employment within the corporation remained fairly constant, there were occasions when employees of Castle would be transferred to Hy-Alloy and vice versa.

In the area of professional services, Castle and Hy-Alloy had the same advertising agency, although they had separate programs; they had the same insurance carriers for property damage and group health insurance, although they had separate policies. They also used the same accounting firm, which was a requirement of the Securities and Exchange Commission, and maintained similar charts of accounts. The two corporations did maintain different legal counsel. Separate pension plans were maintained, but the assets of Hy-Alloy's plan were placed in Castle's employee trust to effect administrative savings and achieve greater earnings.

While additional facts evidencing the interrelationship of the two corporations are contained in the record, we believe the foregoing is sufficient to demonstrate that Castle and Hy-Alloy constitute a unitary business operation under any recognized test.

When we apply the dependency/contribution test utilized in Kansas, it is evident that the operations of Castle in Kansas are dependent upon and contribute to the operations of Castle and Hy-Alloy outside the state and clearly meet the test of a unitary business as set forth in *Crawford* and *Pioneer*.

We conclude from a review of the entire record that it does not support the conclusion of the BOTA that the operations of Castle and Hy-Alloy did not constitute a unitary business. To the contrary, the overwhelming substantial evidence leads to the conclusion that Castle and Hy-Alloy constitute a unitary business operation. We have carefully considered the cases relied upon by the BOTA in its order and, without going into detail, they are clearly distinguishable from the present case. See *Asarco Inc. v. Idaho State Tax Comm'n*, 458 U.S. 307, 73 L. Ed. 2d 787, 102 S. Ct. 3103 (1982); *F. W. Woolworth Co. v. Taxation & Revenue Dept.*, 458 U.S. 354, 73 L. Ed. 2d 819, 102 S. Ct. 3128 (1982). We hold that the BOTA decision is not supported by substantial evidence and, as a result, the BOTA order must be reversed.

In view of the decision reached, we need not address the procedural and other issues asserted by the Department.

The order of the BOTA abating the additional tax assessment is reversed.

SIX, J., not participating.