(40 P.3d 974)
No. 85,855

In the Matter of the Appeal of LEE APPAREL COMPANY, INC.; TROUTMAN INDUSTRIES, INC.; BLUE BELL, INC.; From an Order of the Division of Taxation on Assessment of Corporate Income Tax.

Opinion filed February 15, 2002.

*James Bartle*, of Legal Services Bureau, for appellant Kansas Department of Revenue.

*S. Lucky DeFries* and *Jeffrey A. Wietharn*, of Coffman, DeFries & Nothern, a Professional Association, of Topeka, for appellees Lee Apparel Company, Inc., *et al.*

Before KNUDSON, P.J., PIERRON and GREEN, JJ.

GREEN, J.: This appeal arises out of the audit conducted by the Kansas Department of Revenue (the Department) on Lee Apparel Company, Inc. (Lee), Troutman Industries, Inc. (Troutman), and Blue Bell, Inc. (Blue Bell), collectively referred to as the taxpayers, for calendar years 1988 through 1990. As a result òf its audit, the Department determined that the taxpayers, together with their parent company VF Corporation (VF), and VF's numerous other subsidiaries, were engaged in a unitary business and should have determined their Kansas income tax liabilities using the combined report method. The Department recomputed the tax due and issued three corporate income tax assessments consisting of tax, penalty, and interest in the total amount of $2,907,448.

The taxpayers appealed to the Director of Taxation, contending that VF and its subsidiaries were not unitary. In addition, the taxpayers assert that the assessments for years 1988 and 1989 were barred by the statute of limitations. With the exception of the statutory penalties, which were abated, the Department's assessments were upheld. The Director later denied the taxpayers' petition for review.

When the taxpayers appealed the Director's decision to the Board of Tax Appeals (BOTA), BOTA reversed the Director on both the unitary issue and the statute of limitations issue, which effectively invalidated the Department's assessments.

On appeal, the Department contends that BOTA failed to clearly state and apply the applicable legal presumptions. This issue was previously considered in *In re Tax Appeal of Broce Construction Co.,* 27 Kan. App. 2d 967, 9 P.3d 1281, *rev. denied* 270 Kan. 898 (2000), and we will not reexamine the issue here. Instead, we adopt *Broce's* holding and note that BOTA failed to clearly state that it would presume the Department's determination of unity was correct and that the taxpayers had the burden of proving otherwise. 27 Kan. App. 2d 980-81.

The Department additionally contends that BOTA's order failed to comply with the Kansas Administrative Procedures Act (KAPA), K.S.A. 77-501 *et seq.* We agree that BOTA's order failed to comply

with K.S.A. 77-526(c) because the order failed to include separately stated findings of fact, conclusions of law, and policy reasons for its decision.

The Department raises two additional issues that merit considerable analysis. First, the Department argues that its assessments for the years 1988 and 1989 were not barred by the statute of limitations. We agree. Additionally, the Department maintains that the taxpayers, together with VF and VF's other subsidiaries, were engaged in a unitary business for the years 1988 and 1989. We affirm in part and reverse in part.

VF is a Pennsylvania corporation with its home office in Wyomissing, Pennsylvania. VF is the world's largest publicly owned apparel company, and its principal business is the designing, manufacturing, and marketing of apparel products.

Originally incorporated in 1899 as the Reading Glove & Mitten Manufacturing Company and later known as Vanity Fair Silk Mills, VF operated for many years as a manufacturer of lingerie and intimate apparel. In 1969, it changed its name to VF Corporation and expanded its operations by acquiring companies such as The H.D. Lee Co., Inc. (jeans, 1969); Kay Windsor (lingerie, 1971); Modern Globe (lingerie, 1984); and Bassett-Walker (fleecewear, 1984). In 1986, VF acquired Blue Bell (manufacturer of Wrangler and Rustler jeans, Jantzen and JanSport sportswear, and Red Kap and Big Ben occupational clothing).

VF is a holding company that owns, either directly or indirectly, all of the stock in Lee, Troutman, Blue Bell and numerous other subsidiaries. Many of these subsidiaries are engaged in apparel manufacturing, marketing, and retailing, although others perform functions that complement or support the apparel operations. In each year of the audit period, VF had 22 active subsidiaries, although not all of the same 22 subsidiaries were active in each of those 3 years.

The taxpayers were all in the business of manufacturing various types of apparel. Lee manufactured jeans and jeanswear products. Troutman manufactured Pepsi-branded apparel. Blue Bell had several divisions that manufactured jeans and occupational clothing.

During the audit period, each of the taxpayers had business operations in Kansas. Lee is a Pennsylvania corporation with its home office in Merriam, Kansas. Troutman is a North Carolina corporation and maintained its home office in Lenexa, Kansas, before 1989 when it was merged into Lee. Blue Bell is a Delaware corporation with its home office in Greensboro, North Carolina.

## Statute of Limitations

The Department argues that the tax assessments for tax years 1988 and 1989 were not barred by the statute of limitations. A statute of limitations does not run against the State unless expressly so provided, and all doubts as to whether it shall run are to be resolved in favor of the State. *KPERS v. Reimer & Koger Assocs., Inc.*, 262 Kan. 635, Syl. ¶ 4, 941 P.2d 1321 (1997).

As to questions of law, BOTA exists to decide tax matters; therefore, its decisions should be given due consideration when it is acting within its area of expertise. Nevertheless, "'the determination of an administrative body on questions of law is not conclusive, and while persuasive, is not binding on the courts.' [Citation omitted.]" *Board of Johnson County Comm'rs v. Smith*, 18 Kan. App. 2d 662, 664-65, 857 P.2d 1386 (1993). The appellate courts have unlimited review of questions of law. *Gillespie v. Seymour*, 250 Kan. 123, 129, 823 P.2d 782 (1991).

As the appellant, the Department has the burden of proving that BOTA's actions were in error. K.S.A. 77-621(a)(1). The Department claims that it is entitled to relief because in finding that the 1988 and 1989 assessments were made outside the statute of limitations (1) BOTA erroneously interpreted and applied the law; and (2) BOTA's decision is unreasonable, arbitrary, or capricious.

Under K.S.A. 79-3230(a) (Ensley 1989), the statute in effect for the 1989 tax year, the Department was required to assess income taxes within 3 years after the taxpayers' returns were filed or when the taxes as shown thereon were paid, whichever was the later date. For the tax year 1988, the period of limitations was 4 years. K.S.A. 79-3230(a) (Ensley 1984). The Department concedes that its assessments dated October 20, 1993, were issued more than 3 years

after the taxpayers' 1989 returns were filed and more than 4 years after the 1988 returns were filed.

However, the Department relies on K.S.A. 79-3230(e) (Ensley 1989) in arguing that its assessments are not barred by the statute of limitations. The statute provides:

"(e) Before the expiration of time prescribed in this section for the assessment of additional tax or the filing of a claim for a refund, the director of taxation is authorized to enter into an agreement in writing with the taxpayer consenting to the extension of the periods of limitations as defined in this act for the assessment of tax or for the filing of a claim for refund, at any time prior to the expiration of the period of limitations. The period so agreed upon may be extended by subsequent agreements in writing made before the expiration of the period previously agreed upon. *An agreement between the taxpayer and the internal revenue service providing for the extension of the period for assessment of federal income taxes shall constitute an agreement with the director of taxation to extend the period for assessment of income taxes under the provisions of the Kansas income tax act.* A copy of all such agreements and extensions thereof shall be filed with the director of taxation within 30 days after their execution." (Emphasis added.)

The above-quoted statutory language was also in effect for the 1988 tax year. K.S.A. 79-3230(e) (Ensley 1984).

Although K.S.A. 79-3230(e) was amended in 1997 to eliminate any reference to extension agreements between a taxpayer and the IRS, the amendment was not retroactive. The taxpayers, however, argue that the amendment did not change the existing law but rather clarified the Department's longstanding policy that it could not reopen an audit period when the IRS issued an extension for the assessment of federal income taxes. The taxpayers' argument, however, is contrary to our rule of statutory construction that "[w]hen the legislature revises an existing law, it is presumed that the legislature intended to change the law as it existed prior to the amendment. [Citation omitted.]" *Kaul v. Kansas Dept. of Revenue*, 266 Kan. 464, 471, 970 P.2d 60 (1998), *cert. denied* 528 U.S. 812 (1999). As a result, we find that the issue of whether the Department's assessments were timely is controlled by K.S.A. 79-3230(e) (Ensley 1989) because that version of the statute was in effect during the tax years in question. However, K.S.A. 79-3230(e) (Ensley 1989) has not been interpreted by a Kansas appellate court

and, as a result, whether the Department's assessments were timely under that statute is an issue of first impression.

The Department claims that its assessments for tax years 1988 and 1989 were timely because the taxpayers entered into agreements with the IRS to extend the period for assessment of federal income taxes with respect to tax years 1988 and 1989. The IRS was authorized to assess taxes for those years at any time on or before December 31, 1994. As such, the Department argues that its assessments issued on October 20, 1993, were timely because the assessments were made before the December 31, 1994, federal deadline.

Rejecting the Department's position and determining that the assessments were made outside the statute of limitations based on the policies and practices of the Department, BOTA's order stated:

"[T]he Department had a long-standing policy not to extend the statute of limitation based solely on a federal extension.

"The Board finds that the 1989 amendment would apply to the tax assessments issued here. The law and the practice at the time the taxes were paid was that there was only a three year window of opportunity for the Department to audit and issue an assessment, and that the agreement with the I.R.S. would not be extended to the Department. It is true that the 79-3230(e) was later amended to delete the provision concerning the I.R.S. amendment. However, the testimony of the witnesses indicates that the amendment was to clarify the statute and to codify the existing practice. Furthermore, the testimony indicates that the provision in 79-3230(e) prior to the amendment was thought by the Department to be of dubious legality. Therefore, the assessments for the 1988 and 1989 should be abated."

As noted previously, the taxpayers rely heavily on the Department's long-standing policy to not reopen an audit period when the IRS issued an extension for assessment of federal income taxes. The taxpayers make an alternative argument that even if the Department could reopen an audit period when the IRS issued an extension, the federal waiver did not extend the state limitations period except to address changes resulting from the federal review. The taxpayers point out that the Department's assessments were not prompted by a federal adjustment. Instead, the Department assessed the additional tax based upon a determination that the taxpayers were unitary, which is not a federal issue.

To support its position that a federal extension should not affect the state limitations period except to address changes resulting from federal review, the taxpayers cite *Kelly-Springfield Tire v. Bd. of Tax Rev.*, 414 N.W.2d 113 (Iowa 1987), *aff'd sub nom., Shell Oil Co. v. Iowa Dept. of Revenue*, 488 U.S. 19 (1988). The *Kelly-Springfield* court addressed whether the Iowa Department of Revenue's right to assess additional tax liability during an extended 6-month period following a federal audit was unlimited in scope or limited to corrections resulting from action taken in a federal review. The statute in question provided in pertinent part:

"Notwithstanding the periods of limitation for examination and determination heretofore specified, the department shall have six months to make an examination and determination from the date of receipt by the department of notice from the taxpayer of the final disposition of any matter between the taxpayer and the internal revenue service with respect to the particular tax year." Iowa Code § 422.25(1) (1977).

The *Kelly-Springfield* court found that under the statute, the Iowa Department of Revenue was restricted from assessing additional tax liability unless the federal audit altered circumstances affecting the taxpayer's Iowa tax liability. 414 N.W.2d at 115-16.

The taxpayers' reliance on *Kelly-Springfield*, however, is misplaced because the statute addressed in that case is substantially different from K.S.A. 79-3230(e) (Ensley 1989). Instead, the statute addressed in *Kelly-Springfield* is analogous to K.S.A. 79-3230(f) (Ensley 1989), which provides:

"Any taxpayer whose income has been adjusted by the federal internal revenue service is required to report such adjustments to the Kansas department of revenue by mail within 180 days of the date the federal adjustments are paid, agreed to or become final, whichever is earlier. Such adjustments shall be reported by filing an amended return for the applicable taxable year and a copy of the revenue agent's report detailing such adjustments. . . .

"Notwithstanding the provisions of subsection (a) or (c) of this section, additional income taxes may be assessed and proceedings in court for collection of such taxes may be commenced and any refund or credit may be allowed by the director of taxation within 180 days following receipt of any such report of adjustments by the Kansas department of revenue. No assessment shall be made nor any refund or credit shall be allowable under the provisions of this paragraph except to the extent the same is attributable to changes in the taxpayer's income due to adjustments indicated by such report."

Clearly, K.S.A. 79-3230(f), not K.S.A. 79-3230(e), authorizes the Department to assess state taxes based on federal income adjustment. The plain language of K.S.A. 79-3230(f) provides that assessments may be issued thereunder only to the extent they are attributable to federal income adjustments. In contrast, K.S.A. 79-3230(e) imposes no restrictions on the scope of the Department's ability to assess taxes, provided such assessments are issued within the extended time period agreed upon between the taxpayer and the IRS.

The Department points out that K.S.A. 79-3230(e) is similar to the statute addressed in *Dept. of Rev. v. Gen. Motors Acceptance,* 188 Ariz. 441, 937 P.2d 363 (Ct. App. 1996). The statute addressed in that case provided:

"If a taxpayer agrees with the United States commissioner of internal revenue for an extension or renewals of the period for proposing and assessing deficiencies in federal income taxes for any year, the period for mailing a notice of a proposed income tax deficiency is four years after the return was filed or six months after the date of the expiration of the agreed period for assessing deficiencies in the federal income tax, whichever period expires later." Arizona Rev. Stat. Ann. § 42-113(B)(7) (1991).

The *GMAC* court held that this statute permits the Arizona Department of Revenue to assess state tax deficiencies during the extended limitation period that are unrelated to adjustments made by the IRS in the taxpayer's federal income tax liability. In so holding, the *GMAC* court rationalized:

"In contrast to the statute at issue in *Kelly-Springfield,* A.R.S. section 42-113(B)(7) does not provide for a discrete six-month assessment period that begins upon [the Arizona Department of Revenue's] receipt of notice that a federal audit has altered the taxpayer's federal tax liability. Instead, section 42-113(B)(7) provides that when a taxpayer enters into an extension agreement with the IRS, a concurrent extension of the state assessment limitation commences, and that extension lasts during the entire agreed federal extension and ends six months thereafter. The extension arises under [the statute] regardless of whether the federal audit yields any tax adjustment." 188 Ariz. at 445.

The *GMAC* court further noted that where a taxpayer enters into an extension agreement with the IRS "it is reasonable to accord [the Arizona Department of Revenue] a similar extension for that

tax year regardless of whether the two agencies pursue the same lines of inquiry." 188 Ariz. at 445.

The rationale applied in *GMAC* is persuasive. Similar to the statute addressed in that case, K.S.A. 79-3230(e) (Ensley 1989) does not reference federal income adjustments and does not in any way limit the scope of the Department's ability to assess taxes, other than to require that the assessments be made within the period agreed upon by the taxpayers and IRS. Rules of statutory interpretation prohibit this court from reading the statute "to add that which is not readily found therein or to read out what as a matter of ordinary English language is in it." *Matjasich v. Kansas Dept. of Human Resources*, 271 Kan. 246, 252, 21 P.3d 985 (2001). Moreover,

"[t]ax statutes will not be extended by implication beyond the clear import of the language employed therein; their operation will not be enlarged so as to include matters not specifically embraced. [Citation omitted.] Where there is reasonable doubt as to the meaning of a taxing act, it will be construed most favorably to the taxpayer. [Citation omitted.]" *Board of Leavenworth County Comm'rs v. McGraw Fertilizer Serv., Inc.*, 261 Kan. 901, 905, 933 P.2d 698, *mod. on reh. on other grounds*, 261 Kan. 1082, 941 P.2d 1388 (1997).

Reasonable doubt does not exist as to the meaning of K.S.A. 79-3230(e) (Ensley 1989). The plain language of the statute provides that when a taxpayer enters into an extension agreement with the IRS, a concurrent extension for the assessment of state tax liability commences. Moreover, the statute clearly provides that the state extension lasts for the entire agreed upon federal extension. Furthermore, the plain language of K.S.A. 79-3230(e) (Ensley 1989) does not limit the state assessments to federal income adjustments. Instead, the assessments allowed under the statute are unlimited in scope.

The taxpayers suggest that the Department should be estopped from relying on K.S.A. 79-3230(e) (Ensley 1989). This argument is without merit because the doctrine of equitable estoppel does not operate against the State or against the State's governmental agencies in respect to taxation. See *Harvey County Comm'rs v. School District*, 139 Kan. 457, 459, 32 P.2d 812 (1934).

Because the taxpayers entered into an agreement with the IRS to extend the period for assessment of federal income taxes with respect to tax years 1988 and 1989, the Department's assessments for those tax years issued during the federal extension were timely under K.S.A. 79-3230(e) (Ensley 1989). As a result, we reverse BOTA's determination that the Department's assessments of tax liability for tax years 1988 and 1989 were time barred.

*Unitary Business*

The Department additionally argues that BOTA erred in determining that the taxpayers and the VF Group were not engaged in a unitary business during the audit period. "BOTA orders are subject to judicial review pursuant to the Act for Judicial Review and Civil Enforcement of Agency Actions, K.S.A. 77-601 *et seq.*" *In re Tax Appeal of Derby Refining Co.,* 17 Kan. App. 2d 377, 380, 838 P.2d 354 (1992), *rev. denied* 252 Kan. 1092 (1993). K.S.A. 77-621 provides:

"(c) The court shall grant relief only if it determines any one or more of the following:

. . . .

(7) the agency action is based on a determination of fact, made or implied by the agency, that is not supported by evidence that is substantial *when viewed in light of the record as a whole*, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this act." (Emphasis added.)

"Substantial evidence is such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion." *In re Tax Appeal of Collingwood Grain, Inc.,* 257 Kan. 237, Syl. ¶ 2, 891 P.2d 422 (1995).

As noted previously, the Department, as the appellant, has the burden of proving that BOTA's actions were in error. K.S.A. 77-621(a)(1). The Department claims it is entitled to relief because in finding that the taxpayers did not engage in a unitary business (1) BOTA erroneously interpreted and applied the law; (2) BOTA's action was not based on substantial evidence; and (3) BOTA's action was unreasonable, arbitrary, or capricious.

In defining a unitary business and adopting the test to be applied in determining a unitary business, our Supreme Court in *Crawford Manufacturing Co. v. State Comm. of Revenue and Taxation*, 180 Kan. 352, Syl. ¶¶ 1, 2, 304 P.2d 504 (1956) stated:

"A multistate business is a unitary business for income tax purposes when the operations conducted in one state benefit and are benefitted by the operations conducted in another state or states. If its various parts are interdependent and of mutual benefit so as to form one integral business rather than several business entities, it is unitary."

"Whether a multistate business is separate or unitary depends upon the manner in which its business is conducted. The essential test to be applied is whether or not the operation of the portion of the business within the state is dependent upon or contributory to the operation of the business outside the state. If there is such a relationship, the business is unitary."

See *In re Tax Appeal of Panhandle Eastern Pipe Line Co.*, 272 Kan. 1211, Syl. ¶ 12, 39 P.3d 21 (2002); *In re Tax Appeal of A.M. Castle & Co.*, 245 Kan. 739, Syl. ¶¶ 2, 3, 783 P.2d 1296 (1989); *Pioneer Container Corp. v. Beshears*, 235 Kan. 745, Syl. ¶¶ 3, 4, 684 P.2d 396 (1984); *In re Tax Appeal of Broce Construction Co.*, 27 Kan. App. 2d 967, 971, 9 P.3d 1281, *rev. denied* 270 Kan. 898 (2000). The test is referred to as the dependency or contribution test. *Castle*, 245 Kan. at 743.

"In determining whether two or more business entities actually constitute a unitary business for state income taxation purposes, the application of the . . . [test] is much more difficult than the definition of the test itself." 245 Kan. at 744. The Department has promulgated K.A.R. 92-12-72 to assist in determining whether the activities of a corporation or group of corporations constitute a single trade or business. In K.A.R. 92-12-72, it is recognized that "[t]he determination of whether the activities of the taxpayer constitute a single trade or business or more than one (1) trade or business will turn on the facts in each case." Although each case must be determined on its own facts, there is "a strong presumption that the activities of the taxpayer constitute a single trade or business" when:

"(a) . . . all of its activities are in the same general line.

"(b) A taxpayer is almost always engaged in a single trade or business when its various divisions or segments are engaged in different steps in a large, vertically structured enterprise.

"(c) A taxpayer who might otherwise be considered as engaging in more than one (1) trade or business is properly considered as engaged in one (1) trade or business when there is strong centralized management, coupled with the existence of centralized departments for such functions as financing, advertising, research, or purchasing. Thus, some conglomerates may properly be considered as engaged in only one (1) trade or business when the central executive officers are normally involved in the operations of the various divisions and there are centralized offices which perform for the divisions the normal matters which a truly independent business would perform for itself, such as accounting, personnel, insurance, legal, purchasing, advertising, or financing." K.A.R. 92-12-72.

Nevertheless, our Supreme Court in *Castle* stated that the factors under K.A.R. 92-12-72 were not the only factors to be considered. The *Castle* court pointed out that "[o]ther factors also must be considered in reaching a determination of whether [businesses] were unitary in their operation. The entire record must be examined in the light of the [dependency or contribution] test adopted in *Crawford* and *Pioneer.*" *Castle*, 245 Kan. at 744.

If a taxpayer is engaged in a unitary business, then the Department may require the taxpayer to file state income tax returns using the combined report formula method. K.S.A. 79-32,141. This filing method "calculates the local tax base by first defining the scope of the 'unitary business' of which the taxed enterprise's activities in the taxing jurisdiction form one part." *Container Corp. of America v. Franchise Tax Bd.*, 463 U.S. 159, 165, 77 L. Ed. 2d 545, 103 S. Ct. 2933 (1983). In other words, the first step is to determine what "property, income, or receipts are properly includable in the 'pie' of which the state is attempting to take its fair 'slice' by means of an apportionment formula." 1 Hellerstein & Hellerstein, State Taxation, p. 8-56 (3d ed. 2000). Accordingly, before applying the combined report formula apportionment method of accounting, it is first necessary to determine the apportionable tax base by determining the scope of the unitary business.

Here, the Department was precluded from requiring the taxpayers to file under the combined report formula method because BOTA found that the taxpayers did not participate in a unitary

business. Specifically, BOTA found that "[a]n examination of the evidence does not show that there is the requisite dependency or contribution within the Vanity Fair group such that the Taxpayers are unitary."

## *Proper Application of the Unitary Business Principle*

On appeal, the Department argues that VF and its subsidiaries were unitary. Before addressing the factual issue of whether the taxpayers participated in a unitary business, we find it necessary to discuss the legal questions of whether the Department properly applied (1) the presumption that business operations are unitary if they are engaged in the same general line of business; and (2) the dependency or contribution test. We note that while it is difficult to determine whether corporations are unitary, application of the test for unity in the present case is especially arduous because the taxpayers are subsidiaries in a large corporate conglomerate.

We issued an order to show cause notifying the parties that we intended to raise, sua sponte, the issue of whether the Department properly applied the dependency or contribution test, and afforded the parties a fair opportunity to brief the new issue and present their positions to the court before the issue was finally determined. See *State v. Punkett*, 230 Kan. 596, 601, 640 P.2d 1198 (1982).

The Department concluded that VF and its subsidiaries constituted a unitary business and, as a result, the apportionable tax bases were the gross income from the entire VF Group. At the hearing before BOTA, the Department's auditor testified that the unitary finding was based on the Department's determination that VF was unitary with its subsidiaries and that all of its subsidiaries were unitary with each other. The Department's auditor testified as follows:

"Q   Are you suggesting that each one of the subsidiaries is unitary with VF, as well as being unitary with each other subsidiary?

"A   Ah, yes."

During his testimony, the auditor emphasized that the finding of unity among the subsidiaries was largely based on the fact that the subsidiaries were engaged in the same line of business:

"Q  . . . [O]n what criteria do you determine who would be excluded from the unitary group?

"A  Probably subsidiaries that are in a completely different line of business.

"Q  So if they are in the same line of business, you have a presumption that they have got to be in the unitary group, regardless of what their connections are between each other or between the sub and the parent?

"A  I would say if they're all in the same general line of business, I would probably presume they're unitary with each other.

"Q  Is it possible that somebody could be in the same line of business, but there is autonomy as between the subs themselves and/or the sub and the parent?

"A  Anything is possible."

## A. *Same Line of Business Presumption*

The Department argues that the taxpayers participated in a unitary business because the corporations from the VF Group were engaged in the same general line of business. The Department cites the following language from *Broce* to support its argument: "[B]ecause the taxpayers' business activities were all in the general line of asphalt paving and resurfacing, the taxpayers engaged in a unitary business during the audit period. See K.A.R. 92-12-72(a)." 27 Kan. App. 2d at 973.

This statement, however, must be read in the context of the entire opinion. The *Broce* court stated that the taxpayers were unitary not only because their business activities were in the same general line but also because of other factors listed. 27 Kan. App. 2d at 972-76. In addition to finding that the taxpayers were in the same general line of business, the *Broce* court found that the taxpayers were dependent upon or contributed to the multistate business based on centralized management, overlapping officers and directors, intercompany financing and loan guarantees, intercompany exchanges of capital assets, intercompany transfers of employees, and common administrative functions. 27 Kan. App. 2d at 973-75.

After discussing the previously mentioned factors, the *Broce* court stated in the very next paragraph that "[w]hile additional facts evidencing the interrelationship of Broce Kansas, Broce Oklahoma, and Woodward are contained in the record, we believe the foregoing is sufficient to demonstrate that the taxpayers constituted a unitary business under the dependency or contribution test." 27

Kan. App. 2d at 975-76. The *Broce* court, like the *Castle* court, clearly recognized that a finding under K.A.R. 92-12-72(a) that the taxpayers' business activities were in the same general line, standing alone, was not determinative of whether the taxpayers were unitary. Because the *Castle* court stated that other factors must be considered along with the entire record to determine whether the operation of the portion of the business within the state was dependent upon or contributory to the operation of the business outside the state, the Department's argument that the VF Group was unitary mainly because the corporations were in the same line of business is flawed.

## B. Dependency or Contribution Test

In determining that the taxpayers, VF, and VF's outside subsidiaries were unitary, the Department focused on showing that VF was dependent upon or contributory to its subsidiaries and that the taxpayers had a relationship with several of VF's outside subsidiaries. Although VF was the parent corporation of the taxpayers and the outside subsidiaries, VF was not a Kansas taxpayer. In applying the dependency or contribution test in *Castle*, our Supreme Court determined that because the operations of the business in Kansas were dependent upon and contributory to the operations of the businesses outside the state, the unitary test set forth in *Crawford* and *Pioneer* had been satisfied. *Castle*, 245 Kan. at 748. As a result, the proper application of the dependency or contribution test in this case is whether the operation of the portion of the business within Kansas by the taxpayers was dependent upon or contributory to the business outside the state by VF and by VF's outside subsidiaries.

## Factual Application of the Unitary Business Principle

We now turn to the facts of this case and consider the controlling issue of whether substantial evidence supports BOTA's determination that the taxpayers did not participate in a unitary business during the audit period.

"The Due Process and Commerce Clauses of the [United States] Constitution do not allow a State to tax income arising out of in-

terstate activities—even on a proportional basis—unless there is a ' "minimal connection" or "nexus" between the interstate activities and the taxing State and "a rational relationship between the income attributed to the State and the intrastate values of the enterprise." ' [Citations omitted.]" *Container*, 463 U.S. at 165-66. As a result, the in-state activities must be integrated with the out-of-state activities so as to form one business. In *Crawford*, our Supreme Court declared that "[v]arious portions of a business may be carried on exclusively in different states without destroying its unitary character if the integral parts are of mutual benefit to one another." *Crawford*, 180 Kan. 352, Syl. ¶ 3. See *In re Tax Appeal of Panhandle Eastern Pipe Line Co.*, 272 Kan. 1211, Syl. ¶ 12.

In determining that the taxpayers participated in a unitary business, the Department's auditor cited the following connections among the corporations: (1) Lee and other VF subsidiaries made a 5 percent royalty payment to The H.D. Lee Co., Inc. (a wholly owned subsidiary of VF that held the Lee trademark), for use of the Lee label; (2) Lee Finance (a wholly owned subsidiary of Lee) loaned money to VF subsidiaries for acquisitions and expansions; (3) Bassett-Walker (a wholly owned subsidiary of VF) manufactured shirts using the Lee label for name recognition; (4) Bassett-Walker and Jantzen (a VF subsidiary) manufactured products for each other; (5) all of the VF subsidiaries used the Market Response System (MRS) (a system implemented by VF whereby the subsidiaries could exchange information regarding product development, manufacturing, and inventory); (6) all of the subsidiaries were linked to the central main frame computer and charged a fee; (7) VF's vice president was transferred to Lee to "straighten out this subsidiary"; (8) VF Factory Outlet, Inc. (a wholly owned subsidiary of VF), sold products from all of the VF subsidiaries; (9) VF International Division, Inc. (a wholly owned subsidiary of VF), sold all VF's subsidiaries' goods overseas; (10) VF did all the federal taxes, internal audits, benefits plans, and so forth for the subsidiaries; (11) Modern Globe (a wholly owned subsidiary of VF) marketed Lee branded shirts; (12) there was a large amount of intercompany payables and receivables; (13) 5 to 6 percent of all sales were intercompany; and (14) VF's 1991 annual report stated: "Our

divisions will continue to cooperate whenever possible to make the most efficient use of corporate assets."

As discussed previously, under the dependency or contribution test, the Department needed to show that the taxpayers and the outside corporations were interdependent and of mutual benefit so as to form one integral business. Although the Department argues that the entire VF Group was unitary based on a few relationships among the subsidiaries, the Department's auditor admitted at the hearing before BOTA that a few connections among the subsidiaries did not necessarily establish that the entire VF Group was unitary.

In determining that the entire FV Group was unitary, the Department interwove evidence that the taxpayers were dependent upon or contributory to the operations of VF and that the taxpayers had connections with some of VF's outside subsidiaries with evidence that some of VF's outside subsidiaries were dependent upon or contributory to the operations of VF. The Department confused evidence that some of the outside subsidiaries were dependent upon or contributory to the operations of VF and that the taxpayers had connections with some of VF's outside subsidiaries as proof that the taxpayers were dependent upon or contributory to the operations of VF and to the operations of all of VF's outside subsidiaries.

Instead of proving that the taxpayers were unitary with VF and with all of VF's outside subsidiaries, the Department asks us to accept its argument without the adequacy of supporting evidence. The record is lacking of objective evidence that VF and all its outside subsidiaries operated as a unitary business. As a result, the evidence is also lacking that the taxpayers were dependent upon or contributory to the operations of all of VF's outside subsidiaries.

In fact, the main example of unity cited by the Department that connected the taxpayers with VF and with all of VF's outside corporations was MRS. MRS was a business philosophy initiated by VF's president to enable VF to "produce better, more market-responsive apparel on a more timely basis and at lower costs." VF's subsidiaries had MRS implementation teams which formulated recommendations for improving business operations and customer

service. By 1990, MRS was in place, in varying degrees, in each of VF's divisions. This allowed the various VF subsidiaries to exchange relevant information about apparel designing, manufacturing, and marketing.

Although the taxpayers and the other VF corporations were in the same general line of business, the dependency or contribution test, as discussed previously, must be satisfied. To be unitary, the VF corporations must be "interdependent and of mutual benefit so as to form one business rather than several business entities . . . ." *Crawford Manufacturing Co. v. State Comm. of Revenue and Taxation*, 180 Kan. 352, 359, 304 P.2d 504 (1956). MRS was not an integral part of the operations of the VF corporations so as to make all the corporations interdependent and of mutual benefit to one another.

Nevertheless, MRS can be considered together with other evidence to determine whether the taxpayers' business operations were dependent upon or contributory to VF or to one or more of VF's outside subsidiaries or both so as to constitute one integral business. The *Pioneer* court held that corporations were unitary in part because the executive staff of the parent company furnished its business experience and operational expertise to the subsidiary. *Pioneer Container Corp. v. Beshears,* 235 Kan. 745, 749, 684 P.2d 396 (1984) Because MRS was VF's concept and was implemented at its direction, the system links the taxpayers with VF and with all of VF's outside subsidiaries.

VF not only implemented MRS but also performed numerous administrative functions for the taxpayers. One of the administrative functions undertaken by VF was a blanket insurance policy that covered various forms of risk for itself and its subsidiaries. In addition, VF maintained both a pension and profit-sharing plan in which its subsidiaries could participate. Substantially, all employees of VF's subsidiaries were covered by the pension plan. One of VF's wholly owned subsidiaries provided the other subsidiaries with a centralized computer system. In addition, VF did federal taxes for the subsidiaries and performed internal audits. The expenses incurred by VF for those administrative functions were allocated to its subsidiaries in the form of a management fee. Although VF

passed administrative expenses to its subsidiaries, the subsidiaries benefitted from economies of scale as they were able to acquire such things as insurance through VF for less than what the subsidiaries could have obtained elsewhere. Shared administrative functions are referenced in K.A.R. 92-12-72(c) as relevant to the unitary inquiry. See *In re Tax Appeal of A.M. Castle & Co.*, 245 Kan. 739, 747, 783 P.2d 1296 (1989).

In addition, substantially all of the borrowing to support the operations of VF and its subsidiaries was done by VF. VF made loans and advances to many of its apparel manufacturing subsidiaries, but most notably to Lee. VF's loans and advances to Lee averaged $530 million per year during the audit period. In addition, interest paid by Lee to VF totaled an average of $45 million per year. VF also made substantial loans and advances to Blue Bell and made loans and advances to Troutman totaling $4,396,000 during the audit period. Intercompany financing and loan guarantees have been cited as factors in determining whether corporate operations are unitary. See *Castle*, 245 Kan. at 746; *In re Tax Appeal of Broce Construction Co.*, 27 Kan. App. 2d 967, 974, 9 P.3d 1281, *rev. denied* 270 Kan. 898 (2000).

Another factor frequently cited in support of a finding of unity is interlocking officers and directors. *Castle*, 245 Kan. at 745-46; *Pioneer*, 235 Kan. at 749; *Broce*, 27 Kan. App. 2d at 974. Here, a core group of managers served both VF and many of VF's subsidiaries, including the taxpayers. Moreover, VF's board of directors held regular meetings that were attended by its board members and often by officers of VF and its subsidiaries. In contrast, the board of directors of both Lee and Blue Bell did not hold actual meetings, but rather transacted business by written consent. See *Castle*, 245 Kan. at 746 (parent company held quarterly board meetings where management policies and decisions were explored in detail, whereas the subsidiary's board generally acted by written consent).

In addition to interlocking directors, the taxpayers also benefitted from a group of vice presidents who were employed by VF and functioned as senior advisors to the subsidiaries and furnished a link between each subsidiary and VF. The taxpayers, however, ve-

hemently disagree with the Department's contention that they benefitted from strong centralized management. It is important to remember that strong centralized management is merely one of many factors to be considered in determining whether corporate operations constitute a unitary business. See K.A.R. 92-12-72. Even if VF did not contribute to the taxpayers' operations by providing strong centralized management, other indicators of a unitary business existed.

For example, unity of ownership, a factor often mentioned in finding a unitary business, was present in this case. *Castle,* 245 Kan. at 745; *Pioneer,* 235 Kan. at 749; *Crawford,* 180 Kan. at 361. VF, either directly or indirectly, owned all the stock in the taxpayers. In addition, as owner of all the stock in the taxpayers, VF had control over the election of directors for the taxpayers. As directors of the taxpayers' corporations, they would be responsible for the management of the corporations and the hiring of the officers and management personnel. This was cited as a unitary factor in *Castle,* 245 Kan. at 746.

Based on the previously stated factors, we find that the taxpayers' functions were dependent upon and contributory to the operations of VF. It is evident that the taxpayers' business operations with VF met both prongs of the test for a unitary business. As a result, the record does not support BOTA's conclusion that the operations of the taxpayers with VF did not constitute a unitary business during the audit period. To the contrary, the overwhelming substantial evidence leads to the conclusion that the taxpayers and VF participated in a unitary business.

Although we found that the taxpayers were not unitary with the outside subsidiaries as a whole, substantial evidence existed that the taxpayers were integrated with some of the out-of-state subsidiaries so as to form one business. The Department cited intercompany sales by VF Factory Outlet (VFFO) as evidence of unity. The Department stated that the taxpayers contributed to VF's vertically structured enterprise by selling goods to VFFO. See K.A.R. 92-12-72(b). During the audit period, approximately 7% to 11% of Lee's total annual sales were to VFFO. On the other hand, VFFO purchases from Lee accounted for 38% to 39.3% of VFFO's total an-

nual purchases. In 1988, approximately 32% of Troutman's total sales were to VFFO. Although Blue Bell's sales to VFFO were substantially less than Lee's and Troutman's sales, Blue Bell nevertheless participated in VF's vertically structured enterprise by manufacturing goods for VFFO. The taxpayers contributed to the operations of VFFO by supplying it with inventory. At the same time, the taxpayers were dependent upon VFFO as a market for their goods. Significant intercompany sales was cited in *Crawford* and *Castle* as a factor supporting the finding that the taxpayer's operations were unitary.

Another example of the taxpayers' dependency on other VF subsidiaries is evidenced through the use of trademarks. The Lee trademark is held by The H.D. Lee Co., Inc. (H.D. Lee), a wholly owned subsidiary of VF. Lee paid an average of $26 million annually in royalties to H.D. Lee for use of the Lee label. A similar arrangement existed between Blue Bell and Bassett-Walker, Inc. (Bassett-Walker), another wholly owned VF subsidiary. Bassett-Walker manufactured goods bearing the Wrangler label and made royalty payments to Blue Bell. In addition, Troutman made royalty payments to VF, and other VF subsidiaries made royalty payments to Lee. The arrangements benefitted all of the parties involved inasmuch as there was obvious mutual interdependence between the holder of a trademark and those who utilized it. The trademarks made the products more attractive to consumers, thereby increasing sales, which in turn generated increased royalty income for the holders of the trademarks.

The taxpayers were also dependent on VF subsidiaries for intercompany financing and loan guarantees. For example, Lee Finance, Inc. (Lee Finance), a wholly owned subsidiary of Lee, financed corporate acquisitions. In fact, Lee Finance enabled VF to acquire Blue Bell by providing loans to replace Blue Bell's pre-acquisition debt. During the audit period, Blue Bell paid Lee Finance an average of $40 million in interest per year.

As a result, we determine that the taxpayers, VF, VFFO, H.D. Lee, and Lee Finance were interdependent and of mutual benefit so as to constitute one integral business. The taxpayers, VFFO, H.D. Lee, and Lee Finance were dependent upon VF for account-

ing services, management expertise, financing, product development, and marketing. VF and VFFO were dependent upon the taxpayers to supply apparel to VFFO and to VF's other subsidiaries. This resulted in a steady source of supply for VFFO and for VF's other subsidiaries. A steady source of supply was cited as a unitary factor in *Castle.* 245 Kan. at 746. Lee was dependent upon H.D. Lee for use of the Lee trademark. Blue Bell was dependent upon Lee Finance for borrowing capital. As a result, the operations of the taxpayers were dependent upon or contributory to the operations of VF, VFFO, H.D. Lee, and Lee Finance outside the state and met the test of a unitary business.

We determine from a review of the entire record that BOTA correctly determined that the taxpayers were not unitary with the entire VF Group. Nevertheless, we determine that the record does not support BOTA's conclusion that the operations of the taxpayers, VF, VFFO, H.D. Lee, and Lee Finance did not constitute a unitary business. On the other hand, substantial evidence existed that the previously mentioned corporations were interdependent and of mutual benefit to one another so as to form one integral business.

Affirmed in part and reversed in part.