NOT DESIGNATED FOR PUBLICATION

No. 119,055

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

APPRENTICE JUAN DESHAZER,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; SETH L. RUNDLE, judge. Opinion filed May 10, 2019. Affirmed.

*Michael P. Whalen*, of Law Office of Michael P. Whalen, of Wichita, for appellant.

*Lesley A. Isherwood*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before LEBEN, P.J., GREEN and POWELL, JJ.

PER CURIAM: Apprentice Juan Deshazer was convicted of three counts of attempted first-degree murder, one count of attempted second-degree murder, and several other person felonies. Our court affirmed these convictions in 2015. Deshazer subsequently filed a timely K.S.A. 2018 Supp. 60-1507 motion, which the district court summarily dismissed. Deshazer now appeals that dismissal. Finding no reversible error by the district court, we affirm.

1

A jury convicted Deshazer of three counts of attempted first-degree murder, one count of attempted second-degree murder, and several other person felonies in 2012. On Deshazer's direct appeal of those convictions to this court, he raised two issues: (1) the denial of the request for an attempted voluntary manslaughter instruction and (2) the admission of hearsay evidence. *State v. Deshazer*, No. 108,453, 2015 WL 5311440, at *4-8 (Kan. App. 2015) (unpublished opinion). Because of the issues Deshazer raised in his K.S.A. 60-1507 motion, inclusion of the facts that supported his conviction is necessary.

"On July 14, 2011, Timothy McCoy went to Club Rodeo with his wife, Sara Fischer, his brother, Kevin Walker, and their cousin, Jeffrey Daniels. They arrived around 11:00 p.m. in McCoy's 1997 white Crown Victoria. Local law enforcement considered Daniels to be a member of the Bloods street gang and Walker as a person associated with the Bloods.

"The group stayed at the club until about 1:30 a.m. on July 15, 2011, when the club's lights were turned on in order to signal people to leave. All four individuals later testified that they were not involved in any altercations inside the club. On their way back to the car, they noticed a few fights occurring in the back of the parking lot but they had no trouble reaching the car. McCoy drove, Fischer sat in the front passenger seat, Daniels sat in the rear driver-side seat, and Walker sat in the rear passenger-side seat. McCoy attempted to maneuver out of the parking lot but quickly had to stop because a group of about 15 to 20 people had gathered around the vehicle.

"McCoy flashed his headlights at people standing in front of the car attempting to signal that he was trying to exit the lot. A young man wearing a dark blue shirt turned around and punched the hood of the vehicle. Blue is the primary color of the Crips street gang. Several people in the group began beating on the car's windows. McCoy got out of the car and began arguing with the man who had punched his car. Fischer began arguing with a group of women who had been banging their hands on the car's windows. She later

testified that she noticed a woman with something metal in her hand approach McCoy, so she threw the car's plastic ashtray at the woman, but it did not hit anyone. No physical altercation ensued and Officer Jamie Schepis, an off-duty police officer providing security in the club's parking lot, approached to break up the argument. The group of people blocking their way departed, and Officer [Schepis] directed McCoy on how to exit while avoiding the crowds.

"McCoy got back in the car but returned to the same line of vehicles in which he was previously driving. As the vehicle neared the exit, it came to a stop in traffic. Shortly after stopping, several shots were fired into the vehicle, one of which struck Walker in the back of his head. Daniels was struck in his right thigh and left thumb. McCoy attempted to drive away but the engine died and he was unable to restart it. Moments before the shooting, both Daniels and Walker remembered seeing a young male walk within a few feet of the vehicle on the driver's side and begin firing shots. Daniels believed that there were multiple people firing shots.

"Following the shooting, police officers immediately blocked the parking lot exits. Wesley Jensen, a police officer for the City of Wichita, was one of the several officers who arrived to block the exits. About 5 minutes after the shots were fired, a police helicopter notified Jensen that a silver Impala left a line of traffic exiting the lot and was apparently looking for an exit. The helicopter illuminated the vehicle with its spotlight, and as it approached the exit, Officer Jensen yelled and flashed a light to signal the driver to stop. The vehicle tried to maneuver around Officer Jensen, but he stepped in front of the vehicle and hit the hood demanding that the driver stop. After the vehicle stopped, Officer Jensen drew his weapon and opened the driver's door. He saw three individuals in the vehicle and noticed that there was blood on the driver, who was later identified as Ronald Beard. Deshazer was sitting in the front passenger seat, and Jordan James was sitting in the rear driver-side seat. Officers found a 9 millimeter pistol resting on the front passenger seat where Deshazer was sitting. Officers also found a .45 caliber automatic pistol underneath the driver's seat. Both guns' magazines were empty and the .45 pistol had blood on it.

"At the scene of the shooting, officers found four 9 millimeter casings, ten .45 caliber casings, and six .40 caliber casings. They also located another 9 millimeter pistol

3

in the parking lot. The police never located the firearm that fired the six .40 caliber bullets. In total, there were 13 bullet holes in the Crown Victoria and 1 bullet strike where a bullet did not penetrate the vehicle's exterior. There was also one bullet lodged in the vehicle's engine.

"A firearm and tool mark examiner tested the weapons found in the silver Impala and determined that the gun found under Beard's seat fired all 10 of the .45 caliber casings that were recovered. The examiner also determined that two of the 9 millimeter casings were fired by the pistol found on the vehicle's passenger seat, while the other two 9 millimeter casings were fired by the gun found in the parking lot.

"A DNA analyst tested the blood found on the .45 caliber automatic pistol and determined that it belonged to Beard. DNA testing also linked skin cells on the 9 millimeter pistol found in the silver Impala to Deshazer. However, the DNA analyst was unable to link DNA found on the gun in the parking lot to Deshazer, Beard, or three other individuals of interest.

"On July 22, 2011, the State charged Deshazer with four counts of attempted first-degree murder and one count each of aggravated battery against Walker, aggravated battery against Daniels, aggravated assault against Fischer, criminal discharge of a firearm, and criminal possession of a firearm by a convicted felon. The Sedgwick County District Court conducted a 6-day jury trial beginning on March 26, 2012.

"The State's theory at trial was that the shooting was an attempt to avenge the death of Mario Brown, a popular member of the Crips who was apparently murdered about 2 months before the shooting at Club Rodeo. Wichita police suspected that members of the Bloods were responsible for Brown's death and believed that Beard was a close friend of Brown.

"The State called several witnesses who testified about gang activity they observed before the shooting. Officer Schepis testified he saw several Crips gang members leaving the club who appeared to be upset. He also testified that he witnessed many of them flashing Crips gang signs. Officer Schepis later identified Deshazer as a man who was escorted out by another man shortly before the club closed. Officer Schepis

4

noticed that Deshazer was missing his shirt and it appeared to him that Deshazer had been in a fight inside the club. Officer Schepis recognized the other man as Terry Bennett and observed that Bennett had to restrain Deshazer from going back into the club. Officer Schepis also recognized Beard as one of the individuals arguing with McCoy when he initially stopped his vehicle on the way out of the lot.

"Jason Jones, who was working as a bouncer at Club Rodeo, testified that a few arguments took place throughout the evening and a fight broke out near closing time, which was common. However, Jones was unable to identify the persons involved in the fight. He believed there were about 700 to 800 people in the club that evening. He testified that the club began to shut down shortly after the people involved in the fight were escorted outside.

"Damereo Baldwin, who was at the club that evening, witnessed a fight on the dance floor and stated that the parties were using language associated with the Crips. He also testified that they were gesturing with their hands to make gang signs representing the Crips. Alexus Means, who was at the club with two friends, stated she witnessed someone flashing signs for the Bloods.

"The State also called Ronnie Phillips who testified he was housed in the same jail pod with Deshazer for a month following the shooting. Phillips testified that Deshazer told him he and Beard had been involved in a fight inside the club and then left the club to go to their car and get their guns. Phillips stated that Deshazer told him that he had a 9 millimeter pistol, Beard had a .45 caliber pistol, and the two waited for a certain car to arrive before they began firing. Phillips further testified that Deshazer told him that the shooting was intended to avenge the death of Mario Brown, a fellow member of the Crips with himself and Beard. Deshazer also told him that he twisted his ankle while running back to the car where he sat on his gun.

. . . .

"After a 6-day trial, the jury found Deshazer guilty of all counts except for the count of attempted first-degree murder of Fischer; the jury instead returned a guilty verdict for attempted second-degree murder of Fischer. On May 10, 2012, the district

5

court sentenced Deshazer to serve 620 months' imprisonment for the first count of attempted first-degree murder with the remaining counts running concurrent." 2015 WL 5311440, at *1-4.

The Kansas Supreme Court denied Deshazer's petition for review on June 21, 2016. 304 Kan. 1019.

On June 5, 2017, Deshazer filed his present K.S.A. 60-1507 motion, raising 13 grounds on which he claimed he was being unlawfully detained:

(1) The victims stated he was not the shooter;

(2) His Fifth Amendment rights were violated when the detectives refused to terminate questioning after he said he was done answering questions;

(3) He cannot be convicted of two crimes based on the same conduct;

(4) His trial counsel was ineffective for failing to investigate Sherone Landrum;

(5) His trial counsel was ineffective for failing to investigate Haley Lucero;

(6) His trial counsel was ineffective for failing to investigate Diego Loraga;

(7) His trial counsel was ineffective for failing to investigate Terry Bennett;

(8) His trial counsel was ineffective for failing to investigate and impeach Ronnie Phillips;

(9) His trial counsel was ineffective for failing to investigate inmates stationed in the same pod as him at the detention facility;

(10) His trial counsel was ineffective for failing to investigate the jail chaplain;

(11) His trial counsel was ineffective for failing to investigate Antonio and Ronald Logan;

(12) His trial counsel was ineffective for failing to investigate defendant's potential witnesses; and

(13)   His trial counsel was ineffective because of his counsel's conflict of interest.

Deshazer attached to his motion a police incident report from the shooting. There was no other evidence attached. On July 19, 2017, the district court summarily dismissed Deshazer's motion.

Deshazer timely appeals.

*Analysis*

Deshazer properly raises eight issues on appeal in which he claims entitles him to relief:  (1) The victims stated he was not the shooter; (2) his trial counsel was ineffective for failing to investigate Sherone Landrum; (3) his trial counsel was ineffective for failing to investigate Haley Lucero; (4) his trial counsel was ineffective for failing to investigate Diego Loraga; (5) his trial counsel was ineffective for failing to investigate Terry Bennett; (6) his trial counsel was ineffective for failing to investigate and impeach Ronnie Phillips; (7) his trial counsel was ineffective for failing to investigate Antonio and Ronald Logan; and (8) the district court erred when it "went to great extremes" to find there was no evidence to support Deshazer's claims in his K.S.A. 60-1507 motion.

Deshazer has abandoned the other arguments he raised in his K.S.A. 60-1507 motion on appeal; these issues are deemed waived. *In re Marriage of Williams*, 307 Kan. 960, 977, 417 P.3d 1033 (2018). The remaining claims can placed into three groups:  (A) The victims testified he was not the shooter, meaning he has been wrongfully incarcerated; (B) his trial counsel was ineffective; and (C) the district court erred when it "went to great extremes" to find there was no evidence to support Deshazer's claims.

*Standard of Review*

A district court has three options when reviewing a K.S.A. 60-1507 motion:

> "'(1) The court may determine that the motion, files, and case records conclusively show the prisoner is entitled to no relief and deny the motion summarily; (2) the court may determine from the motion, files, and records that a potentially substantial issue exists, in which case a preliminary hearing may be held. If the court then determines there is no substantial issue, the court may deny the motion; or (3) the court may determine from the motion, files, records, or preliminary hearing that a substantial issue is presented requiring a full hearing.' [Citation omitted.]" *Sola-Morales v. State*, 300 Kan. 875, 881, 335 P.3d 1162 (2014).

The standard of review employed depends upon which of these options a district court utilizes. 300 Kan. at 881.

When the district court summarily denies a K.S.A. 60-1507 motion, as is the case here, we conduct a de novo review "to determine whether the motion, files, and records of the case conclusively show the movant is not entitled to any relief." *Edgar v. State*, 294 Kan. 828, 836-37, 283 P.3d 152 (2012). To be entitled to relief under K.S.A. 2018 Supp. 60-1507, the movant must establish by a preponderance of the evidence that "the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or is otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack." K.S.A. 2018 Supp. 60-1507(b); see Supreme Court Rule 183(g) (2019 Kan. S. Ct. R. 228).

To avoid summary denial of a motion brought under K.S.A. 60-1507, a movant bears the burden of establishing entitlement to an evidentiary hearing. To meet this burden, the movant's contentions must be more than conclusory, and either the movant

8

must set forth an evidentiary basis to support those contentions or the basis must be evident from the record. *Sola-Morales*, 300 Kan. at 881. If such a showing is made, the district court is "'required to grant a hearing, unless the motion is "second" or "successive" and seeks similar relief.'" 300 Kan. at 881; see *State v. Sprague*, 303 Kan. 418, 425, 362 P.3d 828 (2015).

I.      DID THE DISTRICT COURT ERR IN HOLDING DESHAZER IMPROPERLY RAISED A SUFFICIENCY OF THE EVIDENCE ISSUE IN HIS 60-1507 MOTION?

First, Deshazer argues that his K.S.A. 60-1507 motion had merit because the victims in the case either did not see the shooters or testified at the preliminary hearing that none of the shooters were the defendants. In response, the State argues that as this issue is a sufficiency of evidence claim, it is one that should have been raised in Deshazer's direct appeal.

Kansas Supreme Court Rule 183(c)(3) (2019 Kan. S. Ct. R. 229) prohibits a movant from raising trial errors in a K.S.A. 60-1507 motion: "A proceeding under K.S.A. 60-1507 ordinarily may not be used as a substitute for direct appeal involving mere trial errors or as a substitute for a second appeal. Mere trial errors must be corrected by direct appeal."

Deshazer questions the sufficiency of the evidence against him because he asserts—looking only at the motion and the supporting memorandum—that "victims stated [he] was not the shooter." Such a question is appropriate for a direct appeal, not a K.S.A. 60-1507 motion. Because Deshazer should have raised this issue in his direct appeal but did not, the district court did not err in dismissing this claim.

II.    DID THE DISTRICT COURT ERR IN HOLDING DESHAZER FAILED TO SHOW HE RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL?

Deshazer raises six claims of ineffectiveness of his trial counsel on appeal; however, these claims all allege his trial counsel should have investigated, called, or impeached a number of specific witnesses. The State responds that trial counsel's actions were not deficient and there is not a reasonable probability that the outcome of the case would have been any different had these witnesses testified or been impeached.

We employ a two-part test when assessing a claim of ineffective assistance of counsel. "To prevail on such a claim, a criminal defendant must establish (1) the performance of defense counsel was deficient under the totality of the circumstances, and (2) prejudice, *i.e.*, that there is a reasonable probability the jury would have reached a different result absent the deficient performance." *Sola-Morales*, 300 Kan. at 882; see *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674, *reh. denied* 467 U.S. 1267 (1984).

Judicial scrutiny of counsel's performance in a claim of ineffective assistance of counsel is highly deferential and requires consideration of all the evidence before the judge or jury. The reviewing court must strongly presume that counsel's conduct fell within the broad range of reasonable professional assistance. See *State v. Butler*, 307 Kan. 831, 853-54, 416 P.3d 116 (2018). To establish prejudice, the defendant must show a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different, with a reasonable probability meaning a probability sufficient to undermine confidence in the outcome. See *Sprague*, 303 Kan. at 426.

10

A.      *Counsel's alleged error in failing to investigate Sherone Landrum*

First, Deshazer asserts that his counsel was ineffective for failing to investigate Sherone Landrum. In his motion, Deshazer states that Landrum would have proved that Deshazer "was not involved in any way with any fights or shootings" for which Deshazer was convicted. He asserts that the failure to investigate Landrum prejudiced him because "if counsel would have investigated [Landum, counsel] would have learned that [Deshazer] was indeed not involved in said case and that [Deshazer] did not walk out [of] the club with codefendant Terry Bennett."

Assuming only for the sake of analysis that trial counsel's performance was deficient under the totality of the circumstances, Deshazer's motion fails to establish that he was prejudiced and fails to show how Landrum's testimony would have mitigated the evidence against him. While Landrum's testimony may have supported Deshazer's claim that he was not in a fight in the club that night, it does nothing to mitigate the fact that Deshazer was found by law enforcement attempting to flee the scene of the crimes while sitting on one of the weapons used in the shooting. Also damning to Deshazer is the fact that his DNA was found on that weapon. Deshazer has failed to meet his burden in showing ineffective assistance of counsel.

B.      *Counsel's alleged error in failing to investigate Haley Lucero and Diego Loraga*

Deshazer also argues that his trial counsel was ineffective for failing to investigate Haley Lucero and Diego Loraga. He alleges that had his counsel investigated Lucero, he would have learned that Lucero told police that she saw Loraga "cussing and throwing up gang signs" shortly before the shooting. Although Deshazer does not explicitly say how he was prejudiced, he argues that had counsel investigated Lucero the information she would have provided would have drawn "the jury's attention to any gaps in the State's

11

evidence and would have articulated a reasonable doubt theory to the jury." Additionally, Deshazer alleges that Loraga would have testified that Deshazer was not involved in the shooting and that a backseat passenger in the victims' vehicle was shooting out of the vehicle. Deshazer does not explicitly allege how the failure to investigate Loraga was prejudicial.

Again, while assuming but making no determination that counsel's failure to investigate was somehow deficient, we find Deshazer still fails to sufficiently plead that any alleged deficient performance in counsel's investigation into Lucero and Loraga prejudiced him. Importantly, the jury heard testimony from several witnesses—Demareo Baldwin, Darwin Hankins, Alexus Means, Brittany Reed, Andrew Godshall, and Christian Johnson—who witnessed the shooting from different perspectives. Each of these witnesses testified that Deshazer was not involved in any fight or was not identified as the shooter. Yet despite this testimony the jury still found him guilty. Presumably, the testimony from all of these witnesses was insufficient to overcome the other evidence presented that Deshazer was in a vehicle stopped while attempting to flee the scene of the shooting and was found in possession of one of the weapons used in the shooting.

Moreover, although Loraga did not testify at trial, his statements to the police that Deshazer was not the shooter were presented to the jury through Detective Chad Beard's testimony, and forensic evidence presented at trial indicated that the shots were fired into the victims' vehicle, not out of the vehicle. Given all of this evidence, Deshazer fails to show how Lucero's and Logara's testimony would have caused a different outcome in the trial. We see no prejudice; therefore, the district court did not err in denying this claim.

C.     *Counsel's alleged error in failing to investigate Terry Bennett*

Deshazer next argues that his trial counsel was ineffective for failing to investigate Terry Bennett, his codefendant. Specifically, he argues that Bennett's testimony would

12

have exonerated him because Bennett would have testified that Deshazer was not the shooter; rather, he would have testified that Bennett's cousin was the shooter from inside the victims' vehicle. Although he does not explicitly state how he was prejudiced, Deshazer does argue that such evidence would have "articulated a reasonable doubt theory to the jury."

Regarding Bennett, the district court found that at the time of trial Bennett had been an unavailable witness because his plea agreement with the State did not compel his testimony at Deshazer's trial. While we are not bound by such a finding, regardless of Bennett's availability as a witness, Deshazer fails to show how the outcome would have been any different had Bennett testified. Deshazer's motion states that Bennett would have testified that Deshazer was not the shooter and that the true shooter was in the back seat of the victims' vehicle. But as we've previously stated, there were six witnesses who testified at trial they witnessed the shooting and claimed on the stand that Deshazer was not involved in any altercations and/or was not the shooter. Nevertheless, the jury convicted Deshazer of the crimes despite this evidence. There is simply no indication from the record in front of us that another witness testifying to the same ultimate conclusion would have changed the outcome of the jury's verdict. Moreover, there was forensic evidence that directly contradicted the claim that the shots were fired from inside of the victims' vehicle. Again, Deshazer fails to show that but for counsel's alleged error—failing to have Bennett testify at trial—the jury would have returned a not guilty verdict. The district court did not err in dismissing this claim.

D.      *Counsel's alleged error in failing to investigate and impeach Ronnie Phillips*

Deshazer argues that his trial counsel failed to fully investigate and impeach Ronnie Phillips. Deshazer and Phillips were housed in jail together but did not know each other prior to their incarcerations. Phillips testified that while the two were in custody,

13

Deshazer confided many of the details of the shooting and made many inculpatory statements to Phillips. At one point, Phillips testified that Deshazer and one of his codefendants, Ronald Beard, were in the jail chapel together. Although Phillips sought a deal to reduce his sentence in his own case in exchange for the information Deshazer had told him, no such deal materialized. Phillips testified that Deshazer told him that he fired a 9 millimeter firearm that night outside of the club and that the motive for the shooting was to avenge the murder of a friend. Phillips also testified that a third weapon was involved in the shooting but Deshazer told him that gun had been disposed of in a field close to the nightclub.

In his motion, Deshazer argues his counsel should have impeached Phillips because it was impossible for Deshazer and Beard to be in the chapel together because they were "flagged" in green jumpsuits, which indicated that they were not allowed to have contact in jail. He claims he was prejudiced by this deficient performance because the impeachment could have "destroyed Phillips' credibility."

Again assuming that counsel's failure to investigate and impeach Phillips was deficient performance, Deshazer fails to show how the outcome of the trial would have been different. Even if counsel had discredited Phillips' testimony regarding the fact that Deshazer and Beard were in the chapel together, the fact remains that Phillips, who did not know Deshazer before being incarcerated with him, shared details of the crime that only someone associated with the crime would know and were consistent with details of the crime supported by other evidence presented at trial. Whether Deshazer and Beard were in the chapel together has no impact on this testimony corroborated with other evidence.

Additionally, Deshazer's assertion that his trial counsel should have impeached Phillips or made attempts to discredit him is not supported by the record. Deshazer's counsel actually did make such attempts. Counsel presented evidence that contradicted

14

Phillips' assertion that he was not a documented member of a rival gang, solicited testimony that he was in jail for shooting his girlfriend, and highlighted the fact that Phillips contacted the detective with information about Deshazer for the express purpose of receiving leniency in his own case.

As Deshazer fails to establish a reasonable probability that the outcome would have been different, the district court's decision to reject this claim was not error.

E. *Counsel's alleged error in failing to investigate Antonio and Ronald Logan*

Deshazer's final ineffective assistance of counsel claim asserts that his trial counsel was ineffective for failing to investigate Antonio and Ronald Logan. Specifically, Deshazer asserts that "he was with Antonio and Ronald Logan [and through a] proper investigation of these two individuals counsel would have learned that [Deshazer] was in deed with these two." He implicitly states he was prejudiced by this failure to investigate because such testimony at trial "would have showed that [he] did not commit [the] crime." The district court concluded Deshazer's claim was a conclusory, nonspecific assertion of an alibi and rejected it.

In *Shumway v. State*, 48 Kan. App. 2d 490, 502, 293 P.3d 772, *rev. denied* 298 Kan. 1203 (2013), another panel of this court held that defense counsel's failure to call two alibi witnesses was ineffective assistance of counsel. In that case, as in ours, the defense strategy appeared to be a "'theory of innocence.'" 48 Kan. App. 2d at 498. However, in *Shumway*, the two alibi witnesses were the only witnesses who could testify to Shumway's theory of innocence. That is not so in this case. Six witnesses testified that Deshazer was not the shooter or was not involved in any altercation, yet, faced with this testimony and the contradictory physical evidence, the jury convicted Deshazer. We also note that, after hearing all of the evidence, the district judge who presided over the trial denied Deshazer's motion for a directed verdict.

15

Moreover, Deshazer's assertion of this alibi is completely devoid of any details. He simply states "that when the crime occurred he was with Antonio and Ronald Logan." In holding that an alibi can establish a defendant's innocence, the Kansas Supreme Court declared: "An alibi places the defendant at the relevant time in a different place than the scene involved and so removed therefrom as to render it impossible for the accused to be the guilty party." *State v. Pham*, 234 Kan. 649, 656, 675 P.2d 848 (1984); see K.S.A. 22-3218(1). But here there are no details as to when exactly Deshazer was with Antonio and Ronald. Were they in the club? On the other side of the parking lot? In a different car? All Deshazer asserts is that he was with the two men. For all that can be discerned by this statement, all three could have been in very close proximity to the crime together. Such an assertion is not enough to declare counsel's performance deficient. But even if it were, Deshazer again fails to show how he was prejudiced by the failure to investigate these witnesses in light of the evidence presented at trial. Deshazer fails to meet his burden to warrant an evidentiary hearing, and the district court did not err denying this claim.

In summary, we find that Deshazer's numerous accusations of ineffective assistance of counsel lack merit and the district court did not err in dismissing them.

III.    DID THE DISTRICT COURT ERR IN GOING "TO GREAT EXTREMES" TO FIND THAT NO EVIDENCE SUPPORTED DESHAZER'S ASSERTIONS IN HIS K.S.A. 60-1507 MOTION?

Finally, Deshazer argues the district court erred when "it went to great extremes to argue that there was absolutely no evidence to support" his claims. Undermining this argument is its lack of a legal foundation. From a review of the brief, it appears to us that Deshazer's appellate counsel merely uses this argument to reiterate factual assertions which Deshazer alleges supply an adequate evidentiary basis to avoid summary dismissal. But as explained above, these factual assertions lack merit.

Even if we were to assume that the district court somehow erred in the way it reached its holding, the substance of its ruling is of little import on appeal for two reasons. First, our review of Deshazer's motion is de novo. "The definition of a de novo hearing is a decision of the matter anew, giving no deference to findings and conclusions previously made." *In re Tax Appeal of Panhandle Eastern Pipe Line Co.*, 272 Kan. 1211, Syl. ¶ 4, 39 P.3d 21 (2002). Consequently, we sit in the same position as the district court in reviewing the motion, files, and records of the case, and we are not bound by the district court's determinations. See *Edgar*, 294 Kan. at 836-37. Second, even if the district court erred in the way it reached its holding while reaching the correct result, "its decision will be upheld even though the [district] court relied upon the wrong ground or assigned erroneous reasons for its decision." *Montoy v. State*, 278 Kan. 765, 768, 102 P.3d 1158 (2005); see *Gannon v. State*, 302 Kan. 739, 744, 357 P.3d 873 (2015).

We see no error on the part of the district court in its handling of this case and hold that the motion, files, and case records conclusively show that Deshazer is not entitled to relief.

Affirmed.